301 So.2d 74

**GEORGE A. FULLER COMPANY, INC., and the Aetna Casualty & Surety Co.**

v.

**VULCAN MATERIALS COMPANY, SOUTHEAST DIVISION, a corporation, et al.**

**SC 281.**

Supreme Court of Alabama.

Aug. 15, 1974.

Rehearing Denied Sept. 19, 1974.

Jack Livingston, Scottsboro, for appellees.

George V. Eyraud, Jr., Birmingham, for appellee Vulcan Materials Co.

Bell, Richardson, Cleary & Tucker and L. Tennent Lee, III, Huntsville, for appellants.

MADDOX, Justice.[1]

The primary question presented by this appeal is whether an Industrial Development Board is "the state or any county or municipal corporation or subdivision thereof in this state" within the meaning of Alabama's public bonding statute [Title 50, § 16, Code of Alabama, 1940].

This section began as a bill of interpleader filed by the Industrial Development Board of the City of Scottsboro, Alabama, against Revere Copper and Brass, Inc., Western Concrete, Inc., Vulcan Materials, and others.

The Industrial Development Board of the City of Scottsboro was formed under the provisions of Title 37, §§ 815–830, Code of Alabama, 1940. I.D.B. agreed with Revere Copper and Brass, Inc. to construct and equip a manufacturing plant for Revere in Jackson County. Revere agreed to lease the facility for a specified number of years. The rentals would be used by I. D.B. to pay off the bonded indebtedness. Western Concrete had agreed to furnish the concrete for the construction of the plant. When I.D.B. was told by suppliers that Western was delinquent in the payment of their bills, I.D.B. took action.

In the interpleader action, I.D.B. alleged that it owed Western $17,308 under its contract with Western. I.D.B. interpleaded the other respondents, all of which were creditors of Western. The interpleaded respondents had sold to Western merchandise which was used, at least in part, to produce concrete, which went into the construction of the Revere plant. There was no dispute about the amount Western owed these suppliers. The problem was that the $17,308 I.D.B. still owed Western was far short of being enough to pay all of Western's suppliers. That is probably the reason for the cross-bills filed by Western's creditors. Each wanted to be paid in full. In any event, each of Western's creditors filed a cross-claim against Western, the George A. Fuller Company, Inc., and its surety, The Aetna Casualty and Surety Company. The gist of each cross-claim was that each supplier had furnished to Western supplies and materials in prosecution of the work provided for in the contract between I.D.B. and Fuller, and that Western still owed each of them for the supplies and materials. Each claimed that Western was a *subcontractor* of Fuller. Each claimed that Fuller, as principal, and Aetna, as surety, had issued a payment or materialmen's bond as required by Title 50, § 16, and that this bond inured to each materialman's benefit.

1. The writer of this opinion was not sitting when the oral arguments were presented. However, the writer has listened to tape recordings of the entire oral arguments. In fact, the writer has listened to some portions of the oral arguments more than once.

In its final decree the court found (1) that Fuller held itself out to be a general contractor (2) that it maintained this status while the various claimants supplied materials in the furtherance of its contract, and (3) Fuller was, in fact, a general contractor.

The court further found that Western was a subcontractor of Fuller at all pertinent times and that Fuller and Aetna were liable for the value of all materials furnished in the prosecution of the work under Fuller's contract. The court decreed that the provisions of Title 50, § 16, Code of Alabama, were to be read into the bond and that any provisions in the bond inconsistent with the statute were of no force and effect. The court also found that the materials furnished were used or furnished in the prosecution of the work for the construction of I.D.B.'s plant.

Fuller and Aetna appealed.

As already indicated, the threshold question is whether I.D.B. is "the state or any county or municipal corporation or sub-division thereof in this state" within the meaning of Title 50, § 16, which is commonly known as the Alabama public bonding statute. Title 50, § 16, in pertinent part reads:

"Any person, firm or corporation entering into a contract *with the state or any county or municipal corporation or subdivision thereof in this state* for the repair, construction or prosecution of any public buildings or public work, highways or bridges, shall be required, before commencing such work, to execute a * * * bond * * * with the obligation that such contractor or contractors shall promptly make payments to all persons supplying him or them with labor, materials, feed-stuffs or supplies for or in the prosecution of the work provided for in such contract * * *." (Emphasis supplied.)

For this statute to be applicable to the contract and bond in question, I.D.B. must fall within the category of the "state or any county or municipal corporation or subdivision thereof." Does I.D.B. fall within this category? We think not.

This Court has had opportunity to pass upon the designation of industrial development boards on several occasions. Each time this Court has ruled that such boards are public corporations which are "separate entities from the state" and from any political subdivision, including a city or county, within which they are organized. Opinion of the Justices, 254 Ala. 506, 49 So.2d 175 (1950); Edmonson v. State Industrial Development Authority, 279 Ala. 206, 184 So. 2d 115 (1966). In the recent case of Knight v. West Alabama Environmental Imp. Authority, 287 Ala. 15, 246 So.2d 903 (1971), this Court held that the public corporation there involved was not part of the state or a subdivision of the state.

The import of the decisions by this Court involving industrial development boards and other like instrumentalities, is that industrial development boards, while they are public corporations established by the state, county, or city, and while they enjoy certain immunities from taxation, they are not the "state or any county or municipal corporation or sub-division thereof in this state."

Both sides strenuously argue whether Western's status was that of a "subcontractor" or "materialman." Fuller and Aetna claim Western was a "materialman." Western's suppliers claim Western was a "subcontractor" of Fuller. If the public bonding statute was applicable, it would be very important for us to decide whether Western was a "subcontractor" or whether it was a "materialman." We have decided, however, that the public bonding statute is inapplicable; therefore, there is no need for us to determine what status Western occupies.

The judgment of the trial court is reversed and remanded.

Reversed and remanded.

MADDOX, Justice.

## ON REHEARING

Vulcan Materials applies for rehearing and asks this Court to decide whether Western Concrete Co. was a "subcontractor" or a "materialman." The trial court, in its final decree, had found that Western was a "subcontractor." Since we did not decide this issue on original submission, we now consider it. Vulcan alleged in its cross-bill:

"4. Cross-complainant further avers that in said construction contract between the Board and Fuller, the following provision is contained:

'It is mutually understood that the Industrial Development Board of the City of Scottsboro is a public corporation of the State of Alabama and that as such its purchases and consumption or use of certain goods, materials and supplies are or may be exempt from Alabama sales and use tax. The Owner and Contractor agree to cooperate in good faith in availing themselves of any such sales and use tax exemption to the maximum extent economically feasible. It is mutually contemplated that the parties shall adopt substantially the following procedure in availing themselves of such exemption:

Purchases by the Board shall be on its purchase order forms and shall be from vendors selected and at prices negotiated by the Contractor; the Contractor will receive and check the purchased items and audit supplier's invoices and approve them for payment by the Board and will warrant the purchased items and in general assume such other responsibilities with respect thereto as the Contractor would assume under the terms of this Contract in the case of its own purchase of such items. The purchase cost of such items purchased pursuant to this Article XIII plus 4% thereof shall be deducted from the Guaranteed Contract Price but not from the Contractor's fee portion of such guaranteed amounts. In the event that any such exemptions are disallowed, then the amounts due shall be payable by the Owner who agrees to hold the Contractor harmless from any liability for such amounts.'

"5. Cross-Complainant avers it has furnished materials and supplies in the prosecution of the work provided for in such contract between the Board and Fuller to Western, a sub-contractor of Fuller, and to the extent hereinafter set forth, Cross-Complainant has not been paid for such materials and supplies furnished in the prosecution of the work provided for in such contract; that Cross-Complainant is due the sum Eight Thousand Three Hundred Two and no/100 Dollars ($8,302.00) for materials and supplies furnished for the prosecution of the work provided for in said contract between the dates of June 17, 1966 and August 24, 1967, with interest thereon from August 24, 1967."

It is apparent that I.D.B. made purchases from Western on I.D.B. purchase orders and that I.D.B. paid Western. It is apparent also that the purpose of such arrangement was to get a tax benefit. Nevertheless, there is a letter in evidence which shows that Vulcan knew that the purchase orders would be made by I.D.B. In original brief, Vulcan argues as follows:

"Appellant argues that there was no contractural relationship between Fuller and Western. It is to be noted that Appellant argues Fuller's contracts with I. D.B. provide that I.D.B. was given the right to purchase materials from various claimants and that the applicable sales tax was to be deducted from Fuller's contract. Appellee Vulcan argues that this was merely a sham to save Fuller the 4% sales tax. This arrangement in no way mitigated against the fact that Western was a subcontractor of Fuller.

"Appellant argues that no evidence was introduced as to any contract between Fuller and Western. However, the question arises as to why Revere paid Western's bill (Vulcan Ex. No. 9)."

Exhibit 9, referred to in Vulcan's brief, was a letter from Revere to Vulcan which said, in part: "We have been authorized by Western Concrete Incorporated to remit directly to you through the Morgan Guaranty Trust Company of New York the sum of $8,916.13 representing $5,916.13 for July purchases and $3,000 for the August pick-up."

The evidence was overwhelming that there was no contractual relationship between Fuller and Western.

In each of Fuller's contracts with I.D.B., I.D.B. was given the right to purchase certain items of material and the cost of these materials plus 4%, representing the applicable sales tax, was to be deducted from Fuller's contracts. I.D.B. chose to purchase the concrete for use by Fuller under its contracts in this manner. The record shows that the concrete was purchased from Western by *I.D.B.,* not Fuller, pursuant to purchase orders. The cost of this concrete plus 4% was deducted from Fuller's contracts. It should be noted that this purchasing procedure was also used for the purchase of materials from other suppliers. Western was paid by I.D.B. for the concrete supplied, pursuant to the purchase orders; however, toward the end of the job I.D.B. had the trustee of the bond proceeds, Morgan Guaranty, make joint payments to Western and its creditors. Exhibit 9 referred to above seems to indicate this arrangement was followed.

We find no evidence was introduced by any of the appellees that there was a contract between *Fuller* and *Western*. Indeed, the testimony of the Vulcan witness, Lazenby, was to the effect that on July 26, 1966, he received a letter from Revere stating that it had been decided that the concrete would be purchased by I.D.B. on I.D.B.'s *purchase order* rather than by Fuller on its purchase order. This letter further stated that Western would receive its *payment from I.D.B. and not through Fuller*. Mr. Lazenby and Vulcan were then directed to negotiate the matter of payment directly with Western.

We think the trial court's finding that Western was a "subcontractor" of Fuller, under these facts, was clearly erroneous.

Having so decided, we pretermit consideration of argument of Fuller and Aetna that Western, as a supplier of premixed concrete, was a "materialman" instead of a "subcontractor." We do note that the purchase orders from I.D.B. to Western called for Western to deliver vast quantities of *premixed concrete*. These purchase orders do not require Western to furnish any labor or equipment in constructing the building. We note two decisions which have held that suppliers of ready-mixed concrete are "materialmen," not "subcontractors." United States ex rel. Bryant v. Lembke Construction Co., 370 F.2d 293 (10th Cir. 1966); Dupree v. Gaubert Industries, Inc., 403 F.2d 207 (5th Cir. 1968).

The opinion is extended and Vulcan's application for rehearing is denied.

Opinion extended: Application for rehearing denied.

MERRILL, HARWOOD, McCALL and FAULKNER, JJ., concur.