STATE ex rel. Claude E. JARDON,
Jr., Relator,

v.

The INDUSTRIAL DEVELOPMENT AU-
THORITY OF JASPER COUNTY,
Missouri, Respondent.

No. 60594.

Supreme Court of Missouri,
En Banc.

Sept. 12, 1978.

David E. Dwyer, Spencer, Scott & Dwyer, Joplin, Mo., for relator.

Jerry T. Powell, Lawrence M. Berkowitz, Webb R. Gilmore, Ellen S. Holmes, Kansas City, Mo., for respondent.

MORGAN, Chief Justice.

This is an action in the nature of quo warranto and this court has jurisdiction pursuant to Section 4 of Art. V of our Constitution.

The facts are not in controversy since both parties have stipulated as to the essential factual elements.

The original information was filed by the Attorney General at the relation of Claude E. Jardon, Jr., who resides in Jasper County, Missouri, and is a resident taxpayer and duly qualified registered voter in the City of Joplin.

Respondent is a corporation created pursuant to §§ 349.010–349.100, RSMo Supp. 1977,[1] hereinafter referred to as the "Act." Those sections of the Act provide for the creation of an Industrial Development Corporation. Respondent is such a corporation, authorized by the Jasper County Court which approved its Articles of Incorporation and appointed its initial Board of Directors pursuant to the Act.

Respondent has taken steps, required by the Act, to purchase land and construct an office building in an unincorporated area of Jasper County, along with improvements, fixtures, equipment and related support facilities. The entire project is to be leased to Leggett & Platt, Inc., a Missouri corporation, for use as that company's corporate headquarters.

Respondent's intention is to issue and sell, all pursuant to the Act, approximately $1,700,000 of Industrial Revenue Bonds to finance the project. Such bonds would be payable solely out of the lease payments to be made by the company to the respondent. Additionally, respondent intends to execute a mortgage and indenture of trust securing the bonds. The bonds would not be payable from any funds which are raised by taxation; and, the project itself would be subject to all real and tangible personal property taxes of both the state and county.

Leggett & Platt's headquarters is currently in Jasper County at Carthage. The company is engaged in the home furnishings industry with plants and facilities located in various areas of the county. Both parties have stipulated that the availability of tax-exempt revenue bond financing, pursuant to the Act, favorably influenced the company's decision to remain in Jasper County.

It should further be noted that respondent intends to undertake additional projects from time to time, under the Act, which may be located in either incorporated or unincorporated areas of Jasper County and which may include the purchase and construction of facilities to be used as factories, distribution and warehouse facilities, office buildings and pollution control facilities.

The constitutionality of the Act and of the various activities of the respondent pursuant to the Act are challenged by the relator on a number of separate grounds and we will examine such issues individually after first exploring the nature of the Act itself.

The chapter is entitled "Industrial Development Corporations." Therein, are delineated the procedures for incorporation and the resultant powers and limitations of any "authority" formed thereunder.

1. Laws 1977, S.B. 267, §§ 1 to 19.

Such a corporation may be formed by any number of persons, not less than three, ". . . each of whom shall be a duly qualified elector of and taxpayer in the county or municipality." § 349.025. They may proceed by filing with the governing body an application in writing, seeking permission to apply for the incorporation of an industrial development corporation of such county or municipality, to develop commercial, industrial, agricultural (as limited by § 349.020), or manufacturing facilities. If, after consideration, the governing body by appropriate order allows the formation of the corporation, articles of incorporation must be filed setting out the corporation's purpose and other pertinent information. §§ 349.025–030.

The powers of the corporation are set out in § 349.050. They include the power to acquire real and personal property and to improve and maintain one or more projects and further to lease any project and charge rent therefor. In addition, the corporation may issue bonds and temporary notes, invest funds and sell any project to a private or public body. § 349.050.

Revenue bonds may be issued for the purpose of paying any part of the cost of any project, payable out of the revenues of the corporation. § 349.055. Further, trust agreements are authorized to secure notes and bonds. § 349.075.

Finally, projects of the corporation are not tax exempt; however, "Bonds and notes of the corporation are declared to be issued for an essential public and governmental purpose and to be public instrumentalities, and interest thereon and income therefrom shall be exempt from taxation except for death and gift taxes or transfers." § 349.090.

*Point I*

Relator first contends that the Act unlawfully attempts to circumvent the restrictions of Art. VI, § 27 of the Missouri Constitution by permitting the issuance of revenue bonds in cities and counties without approval by a majority of the electors.

This claim is based on the fact that an Authority, pursuant to § 349.055, has the power to issue industrial revenue bonds merely by resolution of its Board of Directors, with no requirement for voter approval. Relator points out, in contrast thereto, that Art. VI, § 27 of the Missouri Constitution authorizes cities, towns and villages of Missouri to issue industrial revenue bonds *only* after voter approval has been obtained. Further, relator points out that bonds may be issued by the Authority for industrial, manufacturing, agricultural, commercial and other purposes set out in the Act, while the Constitution authorizes cities, towns and villages to issue bonds *only* for manufacturing and industrial development.

In other words, relator claims the Act is an attempt to circumvent the Constitution and that the purpose of the Act directly conflicts with Art. VI, § 27 in that such an Authority as the Act creates is *not* a legally separate and distinct entity from the city or county in which it is established. Accordingly, offers relator, when an Authority issues bonds without voter approval, it is merely acting for the city or county and does so in violation of Art. VI, § 27.

Respondent argues that the Act does not contravene Art. VI, § 27 because that specific constitutional provision merely limits the power of the General Assembly to authorize the issuance of bonds by cities, towns and villages and does not limit the General Assembly's power to authorize the issuance of bonds by *other* public entities.

Thus, this issue hinges on whether or not such Authorities as are contemplated by the Act are separate and distinct legal entities from the cities or counties in which they are established. If so, as respondent argues, they do not contravene the Constitution. If they are not "separate entities," relator's position that they do contravene the Constitution would merit consideration.

We, again, note that "separate entity status" for authorities and commissions created by the General Assembly has long been recognized by this court. In *State ex rel. Farmers' Electric Cooperative, Inc. v. State*

*Environmental Improvement Authority,* 518 S.W.2d 68 (Mo. banc 1975), we held that the State Environmental Improvement Authority was such a separate entity. Thus, it, not the state, was liable on the issuance of its pollution control bonds. In that case, as in the present one, the notes and bonds were not issued by the state, but by the Authority, which was created and established as a body corporate. The Authority in this case is referred to by statute as a public corporation and again it, not the state, issues bonds and notes.

In *State ex rel. Farmers' Electric Cooperative, supra,* as in the present case:

"The statutory scheme contemplates that a bond purchaser must look to that company purchasing or leasing a specific project or facility for payment of related principal and interest due on the bond. We quote, as one example, from an indenture heretofore issued by the Authority, to-wit: 'This bond and the interest herein shall not be deemed to constitute a debt of the Authority or the State of Missouri or of any political subdivision thereof, or a pledge of the faith and credit of the Authority or of the State of Missouri or any political subdivision thereof, but this bond shall be payable solely from the receipts and revenues of the Authority from the projects pledged therefor and the Authority is not obligated to pay this bond or the interest hereon except from the receipts and revenues of the Authority from the projects pledged therefor and neither the faith and credit nor the taxing power, if any, of the Authority or of the State of Missouri or of any political subdivision thereof is pledged to the payment of principal or the interest on this bond.'" 518 S.W.2d at 73.

In the current case, the form of the bond (Exhibit N) states that:

"The Bonds and the interest coupons appertaining thereto are limited obligations of the Authority and are payable solely out of the rents and revenues received by the Authority from the Project, and are secured by a pledge of such rents and revenues and a mortgage in favor of the holders of the Bonds. The Bonds and the interest coupons appertaining thereto do not constitute an indebtedness of the Authority or of Jasper County, Missouri, or the State of Missouri, within the meaning of any state constitutional provision or statutory limitation and shall not constitute nor give rise to a pecuniary liability of the Authority or of said County or State nor a charge against the general credit or taxing powers of the Authority or of said County or State."

In fact, § 349.080 declares that:

"Bonds and notes issued under this section by a corporation created by or pursuant to sections 349.010 to 349.100 shall not be a debt of the county, the municipality or the state and neither the county, the municipality or the state shall be liable thereon nor in any event shall such notes or bonds be payable out of any funds or properties other than those acquired for the purposes of this law and such bonds and notes shall not constitute an indebtedness within the meaning of any constitutional or statutory debt limitation or restriction."

Because of the striking similarities between the present statutory authority and that dealt with in *State ex rel. Farmers' Electric Cooperative, supra,* we find the reasoning of the court in that case persuasive in that:

". . . the potential liability of the Authority would not be that of the state under the 'separate entity' status created for it by the Act, which is a principle heretofore recognized by this court. *State ex rel. State Highway Commission v. Bates,* 317 Mo. 696, 296 S.W. 418 (banc 1927); *Christeson v. State Highway Commission,* 40 S.W.2d 615 (Mo.1931); *Board of Public Buildings v. Crowe,* 363 S.W.2d 598 (Mo. banc 1962); *State ex rel. Curators of University of Missouri v. McReynolds,* 354 Mo. 1199, 193 S.W.2d 611 (1946)." 518 S.W.2d at 73.

Relator claims that the fact § 349.025 of the Act requires that the governing body of the municipality or county approve not only

the formation of the Authority but also its Articles of Incorporation negates any "separate entity" status, as does the fact that the governing body elects the Board of Directors of the Authority. Finally, relator argues that the fact § 349.075 gives the county or municipality priority rights in all rights and property of the Authority upon dissolution, subject only to the claims of creditors, is equally persuasive. All told, relator argues these statutory provisions give the governing body such powers over the Authority as to negate any contention that the Authority is a separate entity.

However, this court held such separate entity status did apply to the State Highway Commission, though the status of the Commission was authorized by and controlled by the state. In *State ex rel. State Highway Commission v. Bates*, 317 Mo. 696, 296 S.W. 418, 420 (banc 1927) this court stated clearly, in reference to the Commission, that:

"It is an entity, with powers of a corporation, established and controlled by the state for a specific public purpose, but that does not make this legal entity the sovereign state. No contract it is authorized to make is made in the name of this state, but in the name of the commission. The sovereign state could have contracted for the building of its public highways in its own name, but it chose to create a legal entity for this work. This act gave to this legal entity no part of the state's sovereignty, but authorized it to proceed to do certain work which the state could have had done by private contracts made direct with the state. Thus it has been well said in 14 C.J. at page 75: "'Although a corporation may be public, and not private, because established and controlled by the state for public purposes, it does not necessarily follow that such a corporation is in effect the state, . .'"

Such a Commission said the court, ". . . is not the state . . . but is a mere creature of the state, created for the express purpose of performing a specific work." Id.

That the state *does* create and have some power over such a commission or authority, does not, we have held, negate the separate entity status of the body.

Relator cites *West v. Industrial Development Board of City of Nashville*, 206 Tenn. 154, 332 S.W.2d 201, 203 (1960) for a holding consistent with relator's attack on the separateness of the entity in question here. However, the language cited there is not as helpful as relator suggests. The Supreme Court of Tennessee merely stated without elaboration that though the Industrial Board in that case was a separate corporate entity, the pleadings showed it was also a mere agency or instrumentality of the municipality for purposes of demonstrating that the Board's property was held for a public purpose. In so stating, the court added that the Act authorizing the creation of the Board did not run afoul of a constitutional prohibition against giving or loaning the credit of a city without a referendum. Bonds issued in that case, said the court, were to be retired solely from the revenue of the Industrial Board's projects, thus no city credit was given. 332 S.W.2d at 202. We believe the holding in that case conforms with the separate entity doctrine and belies the oblique reference to "agency or instrumentality" cited rather hopefully by the relator here. We also note that the Supreme Court of Appeals of Virginia examined the independence of operation, incurment of debt and ownership of property in determining that an Industrial Development Authority in the City of Chesapeake *was* a separate entity and, as such, could issue bonds without a vote. Obviously, the issue was nearly identical to that with which we are faced, and the Virginia court held a statute much like our own was not infirm despite a constitutional provision requiring an election for the issuance of bonds by the city. In *Industrial Development Authority of the City of Chesapeake v. Suthers*, 208 Va. 51, 155 S.E.2d 326, 331–32 (1967), the court stated that:

"The respondent argues that the Authority is but the alter ego of the city and is, therefore, subject to the same constitu-

tional limitations as are imposed upon the city. That being so, the respondent says, the Act is rendered unconstitutional because it permits the Authority, acting in place of the city under a 'device or pretense,' to issue bonds without an election in violation of § 127(b) of the Constitution;

\* \* \* \* \* \*

"We have no hesitancy in holding that the Authority is not the alter ego of the city or a 'device or pretense' created to evade constitutional limitations. The Authority is a separate and distinct legal entity established to perform the public purpose designated by the legislature. It is independent of the city in its operations, its incurment of debt, and its ownership of property.

"The revenue bonds proposed to be issued by the Authority will not be the bonds of the city, nor will the city thereby incur any indebtedness or grant its credit to or in aid of any private corporation."

We take special notice of the following reasoning:

"From a reading of the Act, it is clear that there has been created a 'special fund' providing the only means for payment of the bonds issued by the Authority. That fund is to be made up solely of the revenues and receipts derived from the lease or sale by the Authority of its properties. It is equally clear that under such an arrangement the city does not, either directly or indirectly, issue any bonds, incur any indebtedness, or grant its credit to anyone. Thus, there is no violation of §§ 127(b) and 185 of the Constitution." Id. at 332.

It should be noted too that both the Missouri and Virginia statutes provide for creation of the Authority by action of the governing body of the municipality. Both statutes provide for a board of directors to be appointed by the municipalities' governing bodies, and both statutes allow the Authority to issue revenue bonds by a majority vote of that board *without* a vote of the electorate. Neither statute allows bonds of an Authority to constitute a debt of the

governing body *and* upon dissolution of the Authority, title to all property owned by the Authority would rest in the municipality. On the basis of an analysis of all these factors, the Virginia court rejected the claim that such an Authority constituted a device created to sidestep a constitutional provision requiring a vote of the electorate for the issuance of bonds by a city.

The Alabama Supreme Court also has held that Industrial Development Boards in that state are separate entities from the municipalities in which they are organized. *George A. Fuller Company, Inc. v. Vulcan Materials Company, Southeast Division,* 293 Ala. 199, 301 So.2d 74 (1974).

In Opinion of the Justices, 254 Ala. 506, 49 So.2d 175, 179–80 (1950), the Alabama Supreme Court stated:

"Furthermore an industrial development board organized under Act No. 648 cannot be said to be the alter ego or agent of the municipality so that the acts of such a board are the acts of the municipality. An industrial development board under Act No. 648 is a separate and independent corporate entity, the management of the affairs of which is vested in a board of directors. After the governing body of a municipality has authorized the incorporation of an industrial development board under Act. No. 648 and has appointed the members of its board of directors (who serve for staggered terms of six years each), it has no further control over the management and affairs of the corporation, except to appoint additional directors upon expiration of the terms of the incumbents or upon the occurrence of vacancies. Act No. 648 expressly and specifically provides that *the municipality shall not in any event be liable for the payment of the principal of or interest on any bonds of the corporation or for the performance of any obligation of the corporation and that the debts and obligations of the corporation organized thereunder shall not be construed to be debt and obligations of the municipality in which the corporation is organized.* None of the evils sought to be prevented by

Section 94 can arise as the result of any activity of a corporation organized under Act No. 648, since the incurring of obligations by such a corporation cannot result in an expenditure of public funds or in an increased burden of public debt or taxation." (Emphasis added.)

■ Again, the reasoning of the Alabama court is sound and is premised upon a virtually identical statute. For the reasons enumerated throughout this discussion, based on Missouri's existing law and upon the cited opinions from other jurisdictions, we hold that the Authorities created under the Act are separate and distinct entities from the state, counties or municipalities and as such do not violate the constitutional requirement of a popular vote in cities, towns and villages for the issuance of bonds.

Relator finally argues that by so construing the Act, we would allow counties, through Authorities such as this one, to issue revenue bonds without a popular vote, while Art. VI, § 27 not only requires a popular vote by cities, towns and villages, but doesn't even mention counties. Relator reads that as a flat prohibition against county issuance of bonds, buttressing his argument by pointing out that an amendment to Article VI was defeated in 1976 that would have allowed counties to issue bonds on a majority vote of the governing body alone.

We need not delve too deeply into this reading of Art. VI, § 27 by relator, because we agree with respondent that the Article has no application to Industrial Development Authorities created pursuant to the Act. As indicated above, such authorities are separate entities from the city or county in which they are located.

We need only to note our language in *State ex rel. Farmers' Electric Cooperative, Inc. v. State Environmental Improvement Authority, supra,* that:

"The state constitution, unlike the federal constitution, is not a grant of power, but as to legislative power, it is only a limitation; and, therefore, except for the restrictions imposed by the state constitution, the power of the state legislature is unlimited and practically absolute. *Kansas City v. Fishman,* 362 Mo. 352, 241 S.W.2d 377 (1951). An act of the legislature is presumed to be valid and will not be declared unconstitutional unless it clearly and undoubtedly contravenes some constitutional provision. *State ex rel. Eagleton v. McQueen,* 378 S.W.2d 449 (Mo. banc 1964). Legislative enactments should be recognized and enforced by the courts as embodying the will of the people unless they are plainly and palpably a violation of the fundamental law of the constitution. *Borden Company v. Thomason,* 353 S.W.2d 735 (Mo. banc 1962)." 518 S.W.2d at 72.

We find no such plain or palpable violation of the Constitution on this issue and resolve it in favor of the respondent.[2]

*Point II*

Relator contends the Act is unconstitutional because it allows the expenditure of public funds for other than a public purpose by authorizing the issuance of revenue bonds to finance facilities to be used by private corporations in violation of Art. VI, §§ 23–25 and Art. X, § 3.

■ We rule against relator as far as Art. X, § 3 of the Missouri Constitution is concerned because as we stated in *State ex rel. Farmers' Electric Cooperative, Inc. v. State Environmental Improvement Authority, supra* at 75, that section is ". . . confined expressly to 'tax revenues.' The Authority does not levy or collect taxes and does not exercise any taxing power . . .."

2. In *Kansas City v. Fishman,* 362 Mo. 352, 241 S.W.2d 377 (1951), the legislature's power to authorize cities to issue revenue bonds without a vote for the purpose of constructing a parking facility was challenged. The challenge was premised on the contention that the legislature lacked the power to so legislate because of Art. VI, § 27. The court rejected the challenge, holding that the Article only limited the legislature's power to authorize bond issuance as to the kind of utilities explicitly described therein, but did not apply to those not mentioned (in this case public parking facilities).

As to Sections 23 and 25 of Article VI, these constitutional prohibitions are not violated simply because incidental benefits may accrue to private interests. *State ex rel. City of Boonville v. Hackman,* 293 Mo. 313, 240 S.W. 135 (1922). "Furthermore, determination of what constitutes a public purpose is primarily for the legislative department and it will not be overturned unless found to be arbitrary and unreasonable." *State ex rel. Farmers' Electric Cooperative, Inc. v. State Environmental Improvement Authority, supra* at 74 (1975). With that in mind, we note that § 349.090 of the Act specifically declares that bonds issued by an Authority are issued for an essential public and governmental purpose.

Nevertheless, we review this particular purpose in the light of the test laid down in *Dysart v. City of St. Louis,* 321 Mo. 514, 11 S.W.2d 1045, 1047 (banc 1928), as discussed recently in *State ex rel. Mitchell v. City of Sikeston,* 555 S.W.2d 281, 285 (Mo. banc 1977), which requires that the expenditure be:

". . . for the support of the government or for some of the recognized objects of government, or directly to promote the welfare of the community. It may also be conceded that that is a public purpose from the attainment of which will flow some benefit or convenience to the public. In this latter case, however, the benefit or convenience must be direct and immediate from the purpose, . . ."

In the instant case the question is whether the issuance of revenue bonds for commercial, industrial, agricultural and manufacturing facilities does serve a public purpose. We have already so held with regard to issuance of revenue bonds for pollution control facilities. *State ex rel. Farmers' Electric Cooperative, Inc., supra.* We have also held that the issuance of bonds for industrial development of blighted areas serves a public purpose although it was argued therein that benefits to the public were indirect and benefits to private interests were substantial. *State ex rel. Atkinson v. Planned Industrial Expansion Authority of St. Louis,* 517 S.W.2d 36 (Mo. banc 1975). Again, we stated that:

"The law does not require us to determine whether the public or private citizens benefit 'more' by reason of the legislation. Rather, the rule is that if the primary purpose of the act is public, the fact that special benefits may accrue to some private persons does not deprive the government action of its public character, such benefits being incidental to the primary public purpose." Id. at 45.

We note further that several other states have enacted laws which also authorize issuance of revenue bonds to finance and encourage economic development,[3] and that such statutes have been upheld frequently in the face of challenges like that in the instant case. This may be based upon the public benefit of preventing unemployment and promoting economic stimulation or upon the public benefit of keeping pace with other states which have passed legislation designed to facilitate the financing of construction of new industry on a tax exempt basis. *City of Pipestone v. Madsen,* 287 Minn. 357, 178 N.W.2d 594 (1970). Therein, at 603, the Minnesota Supreme Court stated:

"The citizens of Pipestone and the residents of this state will benefit substan-

---

3. See, e. g., Ala.Code tit. 11, §§ 11–54–80 to 101 (1975), Ariz.Rev.Stat. §§ 9–1151 to 1196 (1977); Haw.Rev.Stat. §§ 48–1 to 7 (1968, as amended); Ind.Code Ann. §§ 18–6–4.5–1 to 29 (Burns Cum.Supp.1977); Iowa Ann. §§ 419.1–.16 (West 1976); Kan.Stat. §§ 12–1740 to 1749 (1975, as amended); Me.Rev.Stat. tit. 30, §§ 5325–5341 (1973 Supp., as amended); Mich. Comp.Laws Ann. §§ 125.1601–.1636 (1976); Minn.Stat. §§ 474.01–.15 (1977); Miss.Code Ann. §§ 57–3–1 to 33 (1972); Mont.Rev.Codes Ann. §§ 11–4101 to 4110 (1968, as amended); N.M.Stat.Ann. §§ 14–31–1 to 13 (1976); N.Y. Gen.Mun.Law §§ 850–888 (McKinney 1974, as amended); N.D.Cent.Code §§ 40–57–01 to 20 (1968, as amended); Ohio Rev.Code Ann. §§ 165.01–.20 (1969, as amended); R.I.Gen. Laws §§ 45–37.1–1 to 18 (1971, as amended); S.C.Code §§ 4–29–10 to 150 (1976); Tenn.Code Ann. §§ 6–2801 to 2820 (1971, as amended); Utah Code Ann. §§ 11–17–1 to 17 (1973, as amended); W.Va.Code §§ 13–2C–1 to 20 (1972, as amended); Wyo.Stat. §§ 15–1–801 to 810 (1977).

tially from the proposed transaction. Providing gainful employment for our people will increase their purchasing power, improve their living conditions, and relieve the demand for unemployment and welfare assistance. New or modernized buildings will add properties to the tax lists and increase the tax base. There is little doubt that the establishment of new and improved industry will measurably increase the resources of the community, promote the economy of the state, and thereby contribute to the welfare of its people. These benefits are clearly public in nature."

With a great many states enacting such statutes, a number of courts have resolved the problem similarly. See, e. g., *Green v. City of Mt. Pleasant,* 256 Iowa 1184, 131 N.W.2d 5 (1964), in which it was stated that:

"The concensus of modern legislative and judicial thinking is to broaden the scope of activities which may be classed as involving a public purpose. 37 Am.Jur., Municipal Corporations, Sec. 132. It reaches perhaps its broadest extent under the view that economic welfare is one of the main concerns of the city, state and the federal governments. This is manifested by the great bulk of recent social security programs of the nation and the state. Of special pertinence are those providing for unemployment insurance and security, thus decreasing what the Tennessee Supreme Court calls 'unemployment's twin offspring, hunger and crime.' *Azbill v. Lexington Manufacturing Co.,* 188 Tenn. 477 Sup., 221 S.W.2d 522, 524." 131 N.W.2d at 17.

Without an extended analysis, we do refer to the treatment of this trend in *Mitchell v. North Carolina Industrial Development Financing Authority,* 273 N.C. 137, 159 S.E.2d 745 (1968), in which the North Carolina Supreme Court pointed out that as of ten years ago, at least forty-two states (not counting North Carolina) had held that some form of governmental financing for industrial development serves a public purpose. See cases cited at 159 S.E.2d at 753–

55. The evidence is clear that for some time now the vast majority of jurisdictions have, in the words of the North Carolina Court, concluded that:

"An inadequate number of jobs means an oversupply of labor, which results in low wages. Unemployment and low wages lead to hunger, ill health, and crime. The continued existence of an established industry and the establishment of new industry provide jobs, measurably increase the resources of the community, promote the economy of the state, and thereby contribute to the welfare of its people. The stimulation of the economy is, therefore, an essential public and governmental purpose. The fact that a private interest incidentally benefits from such governmental aid is not fatal if substantial public benefits also result." 159 S.E.2d at 752.

We agree with the above reasoning that improved employment and stimulation of the economy serve essential public purposes.

Relator argues that this particular project is distinguishable from many others in that the office building, though to be built for an industrial concern, is commercial in nature. As such, it places a competitive hardship on other commercial enterprises if it is the recipient of financing assistance. Further, relator cites *State ex rel. Keystone Laundry and Dry Cleaners, Inc. v. McDonnell,* 426 S.W.2d 11 (1968) for refusal to allow the issuance of bonds for a commercial laundry.

We do not agree with relator; nor do we need to decide whether the nature of the enterprise is in fact industrial or commercial. Both are within the language of the statute. We are not convinced that any greater burden falls upon other local enterprises if one is involved rather than the other, and we believe the public interest in an expanded economy with attendant employment outweighs any such hypothetical increase in competition (which has not been demonstrated).

Finally, we distinguish *State ex rel. Keystone, supra.* In that case this court held that a commercial laundry was a "service

business" and not a manufacturing or industrial development so that approval of a project by the industrial development commission was rescinded. The proposed project would have called for issuance of revenue bonds to finance the construction of a building to be leased to a laundry concern under the provisions of §§ 71.790–71.850, RSMo Supp.1965 (now §§ 100.010–100.190).

It should be noted, however, that the statute therein did not refer to and include within its scope, commercial developments, as does the statute involved in the present case. Further, that case merely held that neither the statute involved nor Art. VI, § 27 of the Constitution of Missouri, contemplated a "service business" within the meaning of an industrial or manufacturing plant. We deal here with a different statute and a nonservice plant. Thus, while it is true that a laundry manufactures nothing and is purely a service institution, the court in *State ex rel. Keystone* took pains not to extend its holding beyond the factual situation presented in that case, and the holding is not controlling here.

Relator also alludes briefly to policy reasons for prohibiting a bond issuance to benefit private corporations; however, we are unconvinced that any of these arguments outweigh the public value of a stimulated economy and job market and we cannot hold that the legislative determination of public purpose in this case is arbitrary or unreasonable. Therefore, we hold against relator on this point.

### Point III

Relator next contends that the Act violates Article VI, §§ 23–25 of the Missouri Constitution because it permits the lending of public credit or grant of public money or thing of value to private corporations by authorizing the issuance of revenue bonds to finance facilities to be used by private corporations.

· This contention may be disposed of adversely to relator on either of two theories, both discussed by this court in *State ex rel. Mitchell v. City of Sikeston,* 555 S.W.2d 281 (Mo. banc 1977). We will merely summarize here what we stated at length in that case.

■ First, there is no lending of credit where, as here, revenue bonds are paid solely from the revenue derived from the project and not from taxes. Moreover, in the *Sikeston* case, we cited *New Liberty Medical and Hospital Corp. v. E. F. Hutton & Company,* 474 S.W.2d 1 (Mo. banc 1971) for the proposition that the purpose of the constitutional prohibition against the lending of credit is to prohibit the state from acting as a surety or guarantor of the debt of another. As in the *Sikeston* case, neither the Authority nor any city or county guarantees payment of the bonds.

■ Relator would have us extend the definition of lending of credit to include the use of the name of a city or county in conjunction with the obligation of another. We decline to take this opportunity to consider that question, because under the second reason submitted in the *Sikeston* case, we would uphold the constitutionality of this issue in any event. Therein, we reiterated our position in *State ex rel. Farmers' Electric Cooperative, Inc. v. State Environmental Improvement Authority, supra,* 518 S.W.2d at 74 (Mo. banc 1968) ". . . that the constitutional prohibitions noted are not violated when money and property are expended or utilized to accomplish a 'public purpose.' " As we have already concluded that the project in question does serve a public purpose, this issue is also ruled against relator.

### Point IV

■ Relator also contends that the Act contains more than one subject and the subject of the Act is not clearly expressed in its title in contravention of Art. III, § 23 of the Missouri Constitution. We cannot agree. The Act has one general subject, i. e., the "Establishment of Industrial Development Corporations." Nothing therein deals with other matters. The Constitution is not violated when a section of the Act in question, establishing an Authority, grants

to a public body certain powers to aid the financing, planning and execution of an Authority's development projects. *State ex rel. Atkinson v. Planned Industrial Expansion Authority of St. Louis,* 517 S.W.2d 36, 42 (Mo. banc 1975).

█ Clearly, the controlling test is whether or not all of the provisions of the statute fairly relate to the same subject, have a natural connection therewith or are the incidents or the means to accomplish its purpose. *State ex inf. Barrett ex rel. Bradshaw v. Hedrick,* 294 Mo. 21, 241 S.W. 402 (banc 1922); *Thomas v. Buchanan County,* 330 Mo. 627, 51 S.W.2d 95 (banc 1932). We are confident that the Act meets that test.

█ Further, the title to a statute ". . . needs only to indicate the general contents of the act, and if the contents fairly relate to and have a natural connection with the subject expressed in the title they are within the purview of the title." *State v. Weindorf,* 361 S.W.2d 806, 809 (Mo. 1962). The title to the Act here could neither mislead nor surprise any reader who learns that it contains provisions relating to the financing of its goal. *State ex rel. Atkinson v. Planned Industrial Expansion Authority,* 517 S.W.2d 36, 43 (Mo. banc 1975). Accordingly, we rule against relator on this point also.

### Point V

█ Relator next urges a violation of Art. X, § 6 of the Missouri Constitution which provides that all property of the state, counties and other political subdivisions shall be exempt from taxation. The violation as alleged is that the Act provides that projects financed and constructed pursuant thereto shall be subject to all real and tangible personal property tax.

First of all, we have already found that the Authority is a separate entity from the state or any city or county, see Point I, *supra.*

Secondly, the Authority is not a political subdivision within the meaning of the Constitution. As respondent correctly points out, Art. X, § 15 defines other political subdivisions as follows:

"The term 'other political subdivision' as used in this article, shall be construed to include townships, cities, towns, villages, school, road, drainage, sewer and levee districts and any other public subdivision, public corporation or public quasi-corporation having the power to tax."

To put it simply, the Authority lacks the power to tax; therefore, it is not a political subdivision under the terms of Article X. Thus, there is no constitutional violation on this point, and we so hold.

### Point VI

█ Relator also contends that an unlawful delegation of powers of a municipal corporation would result if the Authority enters into a mortgage and indenture of trust, which is envisioned by said Authority.

Under the trust indenture, as stipulated, a private corporate trustee would handle the proceeds of the bonds used to pay the cost of the project and will receive and disburse the revenue from the project that would be used to pay the principal and interest on the bonds issued by the respondent Authority. Upon default, the Authority must surrender to the trustee possession of its rights to the project property and the trustee has the power to enforce any rights of action granted by the trust indenture. The powers of the trustee in default, as set out in the trust indenture, include the right to take over the management of the project, make improvements or repairs, operate it, lease it, foreclose by sale or equitable proceeding or place the project in receivership.

It is relator's position that these powers are so broad that they result in a virtual abdication by the Authority of its right to control project property and revenues. In behalf of this position, relator relies solely upon *McNichols v. City & County of Denver,* 123 Colo. 132, 230 P.2d 591 (banc 1950). In that case, the Colorado Supreme Court did hold that the mechanism of a trust indenture running to a private trustee under a mortgage of the city's off-street parking meter revenues and giving the trustee

the power to hold both titles to property and funds was an invasion of the powers and duties of the city treasurer and auditor. In that case, it should be noted first that there was no statutory provision comparable to § 349.075 in the instant case which spells out quite clearly the powers of the trustee necessary to protect bondholders' rights to be paid. Secondly, the scheme directly violated specific Denver charter provisions giving the treasurer and auditor the powers and duties the proposed trust indenture undertook to bestow upon the private trustee. The court predicated its holding upon that direct violation of the charter, not upon an unconstitutional delegation of duties of a municipal official. Further, again indicating the distinguishable character of the *McNichols* case, the Colorado Supreme Court later held that the issuance of revenue bonds by a county pursuant to an Economic Development Revenue Board Act was not unconstitutional because of a delegation of power. In that case the Act authorized cities and counties to finance the acquisition of real and personal properties for manufacturing or industrial enterprises, and to lease such properties to private lessees for operation of such projects. As in the instant case, rent from the private lessees was to pay all bond obligations and a mortgage and indenture of trust naming a private trustee covered all project properties. The Colorado court disposed of the attack by stating that the delegation, to be prohibited, would have to be of the type that could be classified as a municipal function, adding that:

> "The fact that the project is for a 'public purpose' does not necessarily make its existence or its function *municipal* in nature. It is the *effect of,* or the benefits flowing from, the completed project and its operation by private enterprise that fulfills the 'public purpose' requirement discussed in Part II above and not, per se, the county's participation therein. The participation as a 'lessor' does not constitute a 'municipal function.'
> "The trustee, under the terms of the financing documents, performs no 'municipal functions' and exercises no control

over a 'municipal improvement' within the usual meaning of those terms." *Allardice v. Adams County,* 173 Colo. 133, 476 P.2d 982, 992 (1970).

The Supreme Court of Kentucky held similarly regarding a trustee with, among other powers, the right to receive and disburse bond proceeds and project revenues. In *Gregory v. City of Lewisport,* 369 S.W.2d 133 (Ky.1963), that court pointed out that:

> ". . . we think there actually is no delegation of power here. The city is in the position of a *borrower,* and the provisions in question are standard for borrowing transactions. A borrower usually has to surrender some of his rights in order to protect the lender. The city here is not surrendering any *governmental* powers. What are involved are simply details of a proprietary transaction." 369 S.W.2d at 136–137.

Also see *Uhls v. State ex rel. City of Cheyenne,* 429 P.2d 74 (Wyo.1967), wherein the Wyoming Supreme Court reached the same conclusion.

We believe that the rights granted to the private trustee in the instant case do not involve any governmental powers. They are merely bestowed upon the trustee for the purpose of protecting a bondholder's expectation of receiving principal and interest payments. As such, they do not constitute an unlawful delegation of power.

### Point VII

Finally, relator contends that the mortgage and indenture of trust, which the Authority intends to enter into, provides for the mortgage of the project and is not authorized under the Act. It is true, as relator points out, that § 349.050, which contains an enumeration of the powers of the Authority, does not specify the power to mortgage the project. However, § 349.075 of the Act does authorize the Authority to vest in the trustee:

> ". . . such property, rights, powers and duties in trust as the corporation may determine. . . . Any such trust agreement may contain such provisions

for protecting and enforcing the rights and remedies of the noteholders or bondholders as may be reasonable and proper. . . . Such trust agreement may contain such other provisions as the corporation determines reasonable and necessary for the security of the noteholders and bondholders. . . ."

Obviously, the indenture provision providing for the conveyance of property in trust to the trustee to take possession of the project and operate it or to foreclose on behalf of bondholders in the event of default is utilized for the purpose of protecting bondholders. A mortgage on revenue-producing property is the usual manner of giving bondholders security in the event of default. It is this added security, above and beyond the soundness of the project, that provides a stimulus for this bond market and the power so to provide falls clearly within the terms of the language used in § 349.075. We regard the mortgage as such a provision as the corporation might " . . . determine reasonable and necessary for the security of the noteholders and bondholders." We read the statute as authorizing the mortgage and accordingly rule against relator on this point, too.

For all of the above enumerated reasons, we believe the Authority conferred upon respondent is valid under the Constitution and laws of this state and the relief sought in the information in the nature of quo warranto is hereby denied.

Judgment accordingly.

BARDGETT, FINCH, DONNELLY, RENDLEN and SEILER, JJ., and HOUSER, Special Justice, concur.

SIMEONE, J., not participating because not a member of the Court when cause was submitted.