J.C. NICHOLS COMPANY, et
al., Respondents,

v.

CITY OF KANSAS CITY, Missouri,
Appellant.

No. WD 32500.

Missouri Court of Appeals,
Western District.

Sept. 21, 1982.

Ilus W. Davis (argued), Aaron A. Wilson, City Atty., Kansas City, for appellant.

Reed O. Gentry (argued), Field Gentry, Benjamin & Robertson, Kansas City, for respondents.

Before NUGENT, P.J., and TURNAGE and LOWENSTEIN, JJ.

NUGENT, Presiding Judge.

This action by taxpayers of Kansas City, Missouri, sought both a declaratory judgment that a lease to a private firm of property owned by the city, formerly used as a fire and police station, was illegal and void and an injunction to prohibit the city from carrying out the lease. The trial court found the lease to be illegal and void and granted the injunction. The defendant appeals from that order. We reverse.

In 1916, the City of Kansas City purchased the property at 63rd Street and Baltimore Avenue, using bond funds created from proceeds of general obligation bonds, and constructed a building used as a police and fire station on the site. In February, 1977 the city ceased using the building as a police station, and in August, 1978 closed the fire station. The city determined that its other departments had no need for the building, and the property became surplus property.

Shortly thereafter, the city began proceedings to determine the ultimate fate of the property. At a meeting of the City Council's Finance and Audit Committee, held January 4, 1979, plaintiffs proposed that the property be sold, the building razed, and the land used as a parking lot. Plaintiff J.C. Nichols indicated a desire to

acquire the property for that purpose. Other interested citizens, among them the president of the Morningside Neighborhood Association, proposed restoring the building. Over the months that followed, representatives of the Wornall Homes Association, the North Hyde Park Homes Association, the Historic Kansas City Foundation, the Landmark Commission, area residents, and numerous other homes associations, spoke in favor of leasing the property to a person who would restore the structure.

On March 16, 1979, the total value of both the land and building was appraised at $120,000. The appraiser also estimated $100,000 would be necessary to bring the building into compliance with City Code requirements, and that an additional $25,000 would be required to finish the interior.

On June 28, 1979, a ten-year lease to the high bidder, Haas Motors, Ltd., was approved by the Finance and Audit Committee.

The lease required the lessee to pay rent of $12,000 per year, bring the building up to Code standards, make all necessary repairs, and recognize the purpose of the city "to maintain the neighborhood and preserve the building".

Plaintiffs filed suit to restrain the city from carrying out the lease, and the matter was submitted to the trial court on the pleadings, including the Stipulation of Parties as to Issues, Parties' Contentions, and Facts. The court's conclusions of law included the following: (1) plaintiffs are proper parties in interest "upon the contention and the proof that the public interests are involved in preventing the unlawful expenditure and disposition of public property and funds"; (2) the public property acquired by the city may not be diverted from public use and used for a private purpose other than for a "purely temporary period"; (3) the lease to Haas Motors, Ltd. is a private and not a public use; (4) surplus city property no longer needed for its original public use must be either devoted to some other public use or disposed of in

"final form"; and (5) a lease is not an act which "finally disposes of such property". Based on these conclusions, the court found the lease to be illegal and void, and defendant was enjoined from carrying out the lease.

This case presents issues of considerable importance and potential impact for city management in Missouri. First, we must determine whether a taxpayer has standing to bring an action against the city when the action does not challenge the expenditure of public funds, but is brought to enjoin an alleged misuse of public property. Second, because the city is expressly empowered under its charter to lease property for a public purpose, we must determine whether a lease of public property to a private firm takes on a public purpose when the city declares its purpose to include maintenance of the neighborhood and preservation of the building. Third, if we do not find such a public purpose, we are asked to determine whether the city is permitted under its charter to lease surplus property for a purely private purpose.

Because this appeal is before us on a stipulation of facts and does not involve a resolution by the trial court of conflicting testimony, the only question before this court is whether the trial court drew the proper legal conclusions from the facts stipulated. *Schroeder v. Horack*, 592 S.W.2d 742 (Mo.1979) (en banc).

On the issue of standing, then, we must decide whether the trial court could properly conclude from the stipulated facts that plaintiffs are proper parties in interest.

The question of taxpayer standing in Missouri has a long and evolving history. As early as 1873, the Missouri Supreme Court held that county taxpayers had sustained the requisite private injury to challenge a subscription by the county to the capital stock of a private railroad because they "are the individual sufferers, rather than the public. The people out of the county bear no part of the burden; nor do the people within the county, except the tax-

payers .... It is therefore an injury peculiar to one class of persons, namely the tax-payers of the county of Macon." *Newmeyer v. Missouri and Mississippi Railroad Co.,* 52 Mo. 81, 89 (1873).

Since *Newmeyer,* proof of an illegal expenditure of public funds has been repeatedly held to be sufficient to show the private pecuniary interest required for standing, simply because the illegal expenditure will necessarily cause the tax burden to increase, and the taxpayer will be called upon to bear the increased burden. The taxpayer is not required to show a direct interest different from that of other taxpayers because the right to sue does not stand on a special damage to the taxpayer, but on a larger principle of public interest. The extent of the taxpayer's actual damage is, therefore, immaterial and need not be shown. *Everett v. County of Clinton,* 282 S.W.2d 30 (Mo.1955); *Berghorn v. Reorganized School District No. 8,* 364 Mo. 121, 260 S.W.2d 573 (1953); *Castilo v. State Highway Commission,* 312 Mo. 244, 279 S.W. 673 (1925) (en banc); *Stocke v. Edwards,* 295 Mo. 402, 244 S.W. 802 (1922) (en banc); *Civic League of St. Louis v. City of St. Louis,* 223 S.W. 891 (Mo.1920); *Missourians for Separation of Church and State v. Robertson,* 592 S.W.2d 825 (Mo.App.1979); *Collins v. Vernon,* 512 S.W.2d 470 (Mo.App. 1974).

In the early years of this century, the cases suggested as well that an actual expenditure from the public treasury was not always necessary for taxpayer standing. In *Harris v. Langford,* 277 Mo. 527, 211 S.W. 19 (1919), the Missouri Supreme Court held that taxpayers had standing to enjoin an illegal agreement between county officials and a local bank for a deposit of public funds. Although no actual expenditure by the county was at issue, the taxpayers were permitted to challenge the officials' failure to obtain bids from other banks simply because they were prosecuting the action on behalf of themselves and other interested taxpayers and had "the legal right to do so". *Id.,* at 21.

Similarly, in *Hight v. City of Harrisonville,* 328 Mo. 549, 41 S.W.2d 155 (1931) (en banc), plaintiffs were held to have standing to challenge the purchase of electrical equipment by the city even though the equipment would be paid for only out of net revenues of the electric plant. This holding was based on plaintiffs' "interest in the electric distribution system ... necessarily affected by the contract." *Id.,* at 158. *Hight* is the only case to which plaintiffs direct us in support of their contention that an expenditure of public funds is not necessary for taxpayer standing. However, Missouri law on this point has evolved beyond that 1931 case.

By contrasting two similar cases, we can see that the movement toward permitting standing in the absence of proof of an illegal expenditure of public funds was short-lived. In *Civic League of St. Louis v. City of St. Louis,* 223 S.W. 891 (Mo.1920), plaintiffs had been permitted to bring an action to enjoin fiscal officers from paying the salary of the superintendent of excavations based on their allegation that the office was illegally held. However, nineteen years later in *Smith v. Hendricks,* 136 S.W.2d 449 (Mo.App.1939), on very similar facts where plaintiffs sought to enjoin the continued employment of a bus driver alleged to be unqualified for the position, the court interpreted *Newmeyer* to permit standing only where the tax burden would be increased, and held that because it would cost as much to hire a qualified driver as an unqualified one, the taxpayers lacked standing. Instead, where the tax burden is not increased, the court held at 454 that "the remedy is the elective franchise."

We find no case decided in Missouri in the last thirty years in which a challenge to government activity was permitted when an illegal expenditure of public funds was not at issue. In *Berghorn v. Reorganized School District No. 8,* 364 Mo. 121, 260 S.W.2d 573 (1953), plaintiffs sought an injunction against expenditures of public tax monies for parochial schools. In *Everett v.*

*County of Clinton,* 282 S.W.2d 30 (Mo.1955), the expenditure of public funds to purchase and operate a rock quarry was at issue. In *Missourians for Separation of Church and State v. Robertson,* 592 S.W.2d 825 (Mo. App.1979), plaintiffs challenged the administration of financial assistance programs which provided funding to certain religious private schools. In all three cases, standing was found.

By contrast, during this same thirty years, standing has been consistently denied in the absence of challenged expenditures. In *Collins v. Vernon,* 512 S.W.2d 470 (Mo. App.1974), plaintiff brought an action to enjoin the city from selling property which had been used as an airport. While the court acknowledged that a taxpayer can have standing solely on the basis of an increased tax burden, the court held at 474 that it could "look beyond the bare facts of the petition to determine if the ultimate fact of damages arises as a necessary conclusion . . . ." Doing so, it found that not only would the proposed sale not increase plaintiff's tax burden, "it appears that the public treasury will be substantially *increased* by the amount of the proposed sale." Accordingly, standing was denied.

Similarly, in *Absher v. Cooper,* 495 S.W.2d 696 (Mo.App.1973), plaintiffs were denied standing to bring an action against the city treasurer for failure to make a full accounting of expenditures as required by statute. The court held at 699 that

> [w]hatever annoyance . . . plaintiffs . . . may have felt because of the actions of the board of aldermen and the treasurer by their interpretation of the involved statutes was not a sufficient basis for the exercise of the court's jurisdiction. A mere difference of opinion or disagreement or argument on a legal question affords inadequate ground for invoking the judicial power.

Similar language can be found in cases where plaintiffs were denied standing to enjoin the sale of revenue bonds when the bonds were not payable from public funds

and hence, would not increase plaintiffs' tax burden. *Spencer v. Village of DeKalb,* 408 S.W.2d 78 (Mo.1966); *Moseley v. City of Mountain Grove,* 524 S.W.2d 444 (Mo.App. 1975).

■ We must conclude that in Missouri, to support taxpayer standing, proof of an illegal expenditure of public funds is not only sufficient, it is essential. This rule was recently stated definitively in *Worlledge v. City of Greenwood,* 627 S.W.2d 328, 331 (Mo.App.1982), where plaintiffs challenged an action by the board of aldermen dismissing personnel in the police department:

> Allegation and proof of illegal expenditure of public funds . . . is . . . an essential element required to demonstrate damage to the class of taxpayers a plaintiff . . . purports to represent. The mere allegation by a citizen that an illegal act has been or is about to be committed by a public officer is not sufficient to permit maintenance of an injunction suit.

Plaintiffs here have alleged that the disputed lease constitutes a "dissipation and expenditure of public property and public funds" which "will necessarily increase the tax burden upon these plaintiffs." Plaintiffs also charge that the fund available for police and fire protection will be reduced by the leasing of the property and that the tax burden to supply new facilities will increase. As we are required to do by *Collins* and *Worlledge,* we "look beyond" the petition to determine if the alleged increase in the tax burden necessarily results from the city's leasing of the property.

■ We hold that it does not. Plaintiffs have not shown that any direct expenditure by the city has or will result from the lease. On the contrary, in the stipulation of facts, the parties state that they are not in agreement on the issue of an increased tax burden and yet, because no trial was held at which evidence was admitted to support that contention, the stipulation is all we have. At oral argument before the trial

court, no evidence was offered of either a direct expenditure of public funds or a likely chain of events which could lead to an increased outlay by the city. Plaintiffs neither produced evidence nor asserted that the $12,000 annual income generated by the lease was less than the annual tax revenues would have been had the property been sold. Although plaintiffs maintain that "the facts support the·allegations", the only fact we have before us on the issue of city finances is that rather than costing the city money, the leased property produces income of $12,000 a year. As to expenditures, we are left only with allegations and conjecture.

This court's function is not to conceive of the possible ill-effects of the city's lease agreement. The plaintiffs bear that burden, as well as the burden of proving the likelihood of such effects. We decline to fill this gap with our own speculations.

Instead, we consider only whether the trial court could properly draw the conclusion that plaintiffs both alleged and proved that their tax burden would increase as a result of the city's actions. Because we find no evidence whatsoever that plaintiffs made any effort to prove that allegation, we find that no evidence in the record supports the trial court's conclusion. We hold, therefore, that plaintiffs are not proper parties in interest in this case.

What we have said to this point constitutes a sufficient basis for reversal of the judgment granting injunctive relief to plaintiffs. Because of the importance of the issues raised in this case, however, we turn to alternative grounds for reversal as well.

The plaintiffs contend that the purpose of the city in leasing the property is purely private and serves no public use. The characterization of the purpose as private or public is critical because, as the parties agree, the city is expressly empowered by § 1(8) of its charter "to ... sell, lease ... or otherwise dispose of property, real or personal, ... for any public or municipal use or purpose ...." At issue is whether a lease of public property to a private firm takes on a public purpose when the city declares its purpose to include maintenance of the neighborhood and preservation of the building.

To resolve that issue, we consider what a "public purpose" is in Missouri.

As early as 1898, in *State ex rel. Garth v. Switzler,* 143 Mo. 287, 45 S.W. 245 (1898), the Missouri Supreme Court addressed the meaning of "public purpose" and, quoting from *Loan Association v. Topeka,* 87 U.S. (20 Wall.) 655, 22 L.Ed. 455 (1874), held 45 S.W. at 249 that "the courts must be governed mainly by the course and usage of the government, the object for which taxes have been customarily and by long course of legislation levied, [and] what objects or purposes have been considered necessary to the ... proper use of government ...."

This rigid rule requiring courts to find public purposes only in what is "customary" and "necessary" was gradually and completely eroded in a series of decisions by the Missouri Supreme Court. First, in *Kansas City v. Liebi,* 298 Mo. 569, 252 S.W. 404 (1923) (en banc), the court recognized at 407 that in order to constitute a public use, the whole community or any large part of it need not be benefited by a proposed action. Instead, benefit to any considerable number is sufficient. Most importantly, the court noted that "a definition or description of the limits of 'public use' is likely to vary with the character of [the] case". The court acknowledged that the public purpose has necessarily been expanded by "modern conditions and the increasing interdependence of the different human factors in the progressive complexity of a community ...."

In *State ex rel. City of Excelsior Springs v. Smith,* 336 Mo. 1104, 82 S.W.2d 37, 39–40 (1935) (en banc), the rule that previous custom and usage of public money was determinative was flatly rejected:

[R]igid adherence to a standard of that kind clearly would interfere with

progress, and would defeat the effectuation of a purpose which changed conditions of life and circumstances would demonstrate to be public . . . not because such purpose was not a public one at the time it was submitted, but because it was not recognized as a public purpose at a previous time, when different conditions existed . . .

This need to avoid rigidity and keep a flexible definition of public purpose in the law was reflected again in *Laret Inv. Co. v. Dickmann,* 345 Mo. 449, 134 S.W.2d 65, 68 (1939) (en banc):

To be guided solely by whether a given activity had, at some previous time, been recognized as a public purpose would make the law static. Such a standard would compel us to retain in the law, as appropriate for public expenditure, activities which have ceased to be of public concern; and would prevent us from adopting new public functions regardless of how essential to the public welfare they may have become by reason of changed conditions.

Finally, in 1950, the Missouri Supreme Court held simply in *Bowman v. Kansas City,* 361 Mo. 14, 233 S.W.2d 26, 32 (1950) (en banc), that no "hard and fast rule" exists for determining whether a specific purpose is public or private. Instead, the term is "elastic, and keeps pace with changing conditions."

The reason for this complete change between 1898 and 1950 in judicial acceptance of what constitutes "public purpose" is obvious. The period was marked by war, depression and radical change in the nature of America's cities. Problems that were not envisioned at the end of the nineteenth century were in desperate need of solution. Programs which addressed those problems were pressed through the Missouri General Assembly and approved by the courts, as all branches of government became aware that "no permanent rules could be formulated

for determining what might be a valid purpose of governmental function for the years immediately ahead." [1]

Not only has Missouri acknowledged that the "public purpose" must change with the times, the courts have recognized as well that they must defer to the legislature when it declares that a specific purpose is public. In *State on Inf. Dalton v. Land Clearance for Redevelopment Authority of Kansas City, Mo.,* 364 Mo. 974, 270 S.W.2d 44 (1954) (en banc), the court held at 52 that where the legislature had deemed certain restrictions on the sale of property taken under eminent domain for the purpose of clearing blighted areas to be in the public interest, that designation "will be accepted by the courts as conclusive evidence that the contemplated use thereof is public, unless it further appears . . . that the legislative finding was arbitrary or was induced by fraud, collusion or bad faith."

In *Parking Systems, Inc. v. Kansas City Downtown Redevelopment Corp.,* 518 S.W.2d 11 (Mo.1974), the court made it clear that this deference extends as well to city councils, by holding at 19 that "the courts will not interfere with a discretionary exercise of judgment by the City Council unless it is clearly erroneous and unreasonable."

In the case before us, the city states in its brief that a primary concern of the city council was the preservation of the character of the 63rd and Baltimore (Brookside) neighborhood. Plaintiffs argue that the city's contention is not supported by the record because the ordinance approving the lease does not refer to such a purpose.

That is true. However, the ordinance is not the only document in the record. In its answer to plaintiffs' petition, the city denies that the property is not used for a public purpose, and states that the lease is intended to permit preservation of an historic structure and to avoid general neighborhood deterioration in the adjacent Brookside area. We do not need to consider

1. Comment, *Missouri's Changing Public Pur-* *pose Doctrine,* 16 St. Louis U.L.J. 658 (1972).

whether this allegation alone would be sufficient to show a legislative determination of public purpose. The lease itself reflects such purpose. In clause six, the lease provides that "it is the purpose of the City to maintain the neighborhood and preserve the building." In clause eight, the parties to the lease agree that "[a]ny repairs, rennovations [sic], or modifications of the building must not change the exterior and must be approved by the Historic Kansas City Foundation." Clause twenty-seven refers to a "developmental plan" apparently set out in lessee's bid for the lease. And finally, clause 4(a) of the addendum to the lease refers to "restoration, renovation and all City mandated improvements." These clauses, particularly the requirement of approval of changes in the structure by the Historic Kansas City Foundation, inarguably show a concern by the city with maintenance and restoration of the building in keeping with the historic nature of the Brookside neighborhood.

In addition, the parties stipulated to the transcript of the city council meetings where this matter was discussed. The transcript is replete with discussion reflecting concern with the preservation of the building and community. Specifically, Councilman Pelofsky stated that "we have been petitioned by several hundred members of the community . . . for the preservation of this structure" and that "[i]f we take this building down for a speculative desire to have more asphalt, it seems to me we're contributing to the outflight of beauty in Kansas City and to the discouragement of economic expansion in Kansas City". Extensive discussion is shown between Councilmen Pelofsky and Watkins on the issue of whether the stability of the community would be destroyed by tearing down the structure. Testimony by Brookside residents and representatives of area homes associations reflects the same concern. The council also had before it a study by the City Traffic Department finding that the parking situation was "not extremely tight".

The record strongly supports the city council's claim that preservation of the neighborhood and the building was its purpose in entering into the lease and shows that this claim is neither arbitrary nor made in bad faith.

While plaintiffs state categorically that the lease is not for a public purpose, they direct us to no authority showing why that must be so. In recognition of Missouri's appreciation of the continuously changing nature of society's needs, we cannot say that, because the purpose claimed by the city is not as traditional as a police station, fire station, public park, or city street, it cannot be a public purpose. On the contrary, Missouri's General Assembly has specifically found a public purpose to exist in this type of activity. In enacting the Land Clearance for Redevelopment Authority Law in 1951 (§ 99.300–§ 99.660), the assembly sought to eliminate or prevent urban deterioration by the acquisition of land and its subsequent sale or lease for redevelopment, renewal or rehabilitation and expressly determined such activities to be "public uses and purposes". It declared that "the necessity in the public interest for" such remedial legislation was "a matter of legislative determination." § 99.310. Although the statute does not specifically deal with the fact situation before us, we cannot ignore such a legislative recognition of the very type of problem with which the city council is concerned in this case.

When a legislative action performed for a public purpose also has a private benefit, Missouri has adopted the "primary purpose" test for determining which effect will be decisive in the characterization of the legislative action. *State ex rel. City of Jefferson v. Smith*, 348 Mo. 554, 154 S.W.2d 101, 102 (1941) (en banc), announced the rule:

> If the primary object of a public expenditure is to subserve a public municipal purpose, the expenditure is legal, notwithstanding it also involves as an incident an expense, which, standing alone, would not be lawful. But if the primary object is not to subserve a public municipal purpose, but to promote some private end, the expenditure is illegal, even

though it may incidentally serve some public purpose.

■ Here, the record shows that the primary purpose of the city, indeed the only stated purpose of the city, was to find a means of preserving the building at minimal cost to city taxpayers, and that any advantages of the lease enjoyed by Haas Motors, Ltd., were only incidental to that legitimate public purpose. Applying the "primary purpose" test, then, the benefits to the private lessee do not invalidate the city's public purpose.

We hold that because deference must be given by this court to a legislative determination of public purpose; because neighborhood preservation is well within a reasonable determination of the changing needs of the Kansas City community in general and the Brookside community in particular; because the record is not lacking in evidence that the city council gave extensive consideration to this purpose before approving the lease; and because no evidence is presented in the record that the city at any time had as its purpose the benefit of the private lessee, the lease by the city to Haas Motors, Ltd., was for a public purpose and was therefore authorized by § 1(8) of the Charter of Kansas City.

Because we so hold, we need not address the question of whether the city is empowered to lease property for a purely private purpose and, therefore, we do not reach the cases cited by plaintiffs on that issue. We do note, however, that *Pickett v. Town of Mercer*, 106 Mo.App. 689, 80 S.W. 285 (1904), to which we are directed by plaintiffs and which held that a village had no authority to use property as a public street when it was bought expressly for use as a public park, is not applicable where a city is specifically authorized by its charter to divert property from one public use to another. Section 128.2 of the Charter of Kansas City specifically addresses that question as follows:

Whenever the city shall have acquired private property for public use ... and the city council ... shall determine that such property is not suitable for the pur-

pose for which it was acquired or that the use for which such property was originally acquired no longer exists, *the city council may ... order such property devoted to some other public use,* or sold or otherwise disposed of ... (emphasis added).

Even in the absence of such a charter provision, we seriously question the wisdom of a court-imposed policy which would require Missouri cities to use public property only for the purpose for which it was originally acquired. If such a policy had actually been imposed at the turn of the century, cities would still be required to provide the same space for hitching posts and watering troughs they furnished when horses were the main means of transportation. More disturbing, our cities would be unable to adapt the uses of city property to the almost unimaginable possibilities of the century ahead. How short-sighted it would be to require cities to maintain city parking lots if the day ever comes that the automobile is as out-of-date as the horse and buggy, and all transportation is by private, family-size aircraft. Such a policy would require cities to dispose of property no longer needed for antiquated purposes, and buy property needed for new purposes, at greatly inflated prices, rather than simply adapt the use of the property from one public purpose to another.

We are not empowered to so tie the hands of Missouri municipal governments and would not do so if we could.

Accordingly, we reverse the trial court's judgment. The case is remanded with directions that the trial judge enter judgment in favor of the appellant City of Kansas City, basing our judgment on the foregoing finding that plaintiffs are not proper parties in interest to bring this action against the city, and alternatively, on a finding that the lease of the city's property at 63rd and Baltimore was for a public purpose and was, therefore, within the powers conferred on the city by its charter.

All concur.