**Dee BURKS, Appellant,**

v.

**CITY OF LICKING, et al., Respondents.**

**No. 22345.**

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 19, 1998.

Motion for Rehearing or Transfer
Denied Nov. 5, 1998.

Application for Transfer Denied
Dec. 22, 1998.

R. Max Humphreys, Carson & Coil, P.C., Jefferson City, for Appellant.

Harvey M. Tettlebaum, Lowell D. Pearson, Husch & Eppenberger, LLC, Bradford E. Ellsworth, Ellsworth and Ellsworth, Jefferson City, for Respondents.

MONTGOMERY, Judge.

This is an appeal from the entry of a summary judgment adverse to Dee Burks (Plaintiff), a resident and taxpayer of the City of Licking, Missouri. The Respondents are the City of Licking, a Fourth Class City in Texas County, Missouri, and Mark Rinne, the Mayor of the City of Licking. We refer to the Respondents collectively as "the City" or "Licking."

Plaintiff's declaratory judgment action, filed September 4, 1997, challenged the City's authority to purchase real estate outside its city limits for the purpose of donating the property to the State of Missouri for the construction of a state penitentiary. The petition also challenged the City's indebtedness to finance the purchase as being "in violation of [Article. VI] § 26(a) of the Constitution of Missouri in that it would cause the City to be indebted in an amount exceeding the revenue provided for 1997 plus any

unencumbered balances from previous years."

On May 5, 1998, the trial court sustained the City's motion for summary judgment. The trial court gave no explanation for so ruling other than holding that "as a matter of law that there are no genuine issues of material fact that are real and substantial...."

Plaintiff's two points on appeal assert that the trial court erred in granting summary judgment to the City (1) "because the City of Licking had no statutory or constitutional authority to acquire real estate outside the city limits for the purpose of giving it to the State of Missouri so the State of Missouri could build a prison in that said project did not constitute a municipal public purpose," and (2) "because the financial obligations assumed by the City in purchasing the land and selling the Certificates of Participation exceeded the limits set by Article VI, Section 26(a) of the Constitution of Missouri without a vote of the people and therefore the transactions were void."[1]

In considering an appeal from the entry of a summary judgment, an appellate court reviews the record in the light most favorable to the party against whom the judgment was entered. *ITT Commercial Fin. Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371, 376 (Mo. banc 1993). The review is essentially *de novo* with the appellate court employing the same tests as should be employed by the trial court in deciding whether to grant the motion. *Id.* The propriety of a summary judgment is purely an issue of law. *Id.* "Summary judgment is granted only where no genuine issue of material fact exists, and judgment is proper as a matter of law." *Cash v. Benward*, 873 S.W.2d 913, 915 (Mo.App.1994).

Licking's Board of Alderman, at a March 4, 1997 meeting, considered a proposal booklet issued by the Department of Corrections of the State of Missouri concerning the location of a 1500 bed, high custody, male correctional facility. Part of the State's proposal

---

1. Both of Plaintiff's points also assert that the trial court erroneously denied Plaintiff's motion for summary judgment. We decline to review this portion of Plaintiff's points because the deni-

al of a motion for summary judgment does not present an appealable issue. *Shelter Mut. Ins. Co. v. DeShazo*, 955 S.W.2d 234, 238 (Mo.App. 1997).

required any interested municipality to provide the land for the correctional facility at no cost to the State.

After considering the State's site selection criteria, the Board of Aldermen then held open meetings for public discussion on whether Licking should submit a proposal to the State. On March 13, 1997, the Board of Aldermen passed the following resolution:

WHEREAS, the State of Missouri, through the Department of Corrections, has issued a request for proposals for location of a 1500 bed, high custody, male correctional facility; and

WHEREAS, the City of Licking is desirous of locating this facility in the Licking area, due primarily to its economic impact on the community; and

WHEREAS, the impact of such a facility on the economy of the Licking area would be significant; and

WHEREAS, the request for proposals issued by the Department of Corrections requires a resolution indicating support from the local governing body for community incentives contained in the proposal for the location of such a facility,

NOW, THEREFORE, BE IT RESOLVED, by the Board of Aldermen of the City of Licking, Missouri, that the following community incentives for the location of a high custody, male correctional facility be included in the City of Licking's proposal and that these incentives enjoy the full support of the Board of Aldermen:

(1) Land for the site to be provided to the State at no cost. Estimated value of the 201 acres included in the proposed site is $400,000.00.

(2) Extension of water services to the proposed site at no cost to the State. Estimated value of the extension of such facilities is $40,000.00.

(3) Extension of sanitary sewer service to the proposed site at no cost to the State. Estimated value of the extension of such facilities is $45,000.00.

(4) New industrial grade street from State Highway 32 to the proposed site at no cost to the State. Estimated value of the new road is $77,000.00

A motion was also approved authorizing Mayor Rinne to sign a Real Estate Option Contract as to the 201–acre tract.

In the fall of 1997, the State selected Licking for the site of the prison from the eighteen proposals presented to the State. Subsequently, Licking acquired ownership of the 201 acres and deeded the land to the State. The parties agree that the 201 acres lay "mostly" outside of Licking city limits. The record shows that approximately 15 acres is located within the city limits. Apparently, all the land lays within a single tract.

In order to finance the land purchase and certain improvements, the City issued $595,-000 worth of "Certificates of Participation." The financial obligations assumed by the City are discussed under Plaintiff's second point.

Initially, Plaintiff claims the City (1) had no statutory authority to purchase the land outside the city limits and (2) had no authority to purchase land to donate to the State in view of Article X, Sections 1 and 3, of the Missouri Constitution.

As to (1), the powers of public subdivisions of the State are limited to those expressed or implied by statute, and any doubt is construed against the grant of power. *State ex rel. St. Louis Housing Authority v. Gaertner*, 695 S.W.2d 460, 462 (Mo. banc 1985). Municipalities are creatures of statute and only have the powers granted to them by the legislature. *State ex rel. Mitchell v. City of Sikeston*, 555 S.W.2d 281, 288 (Mo. banc 1977). Courts generally follow a strict rule of construction when determining the powers of municipalities. *Id.*

For its statutory authority to purchase the land, the City relies, in part, on § 79.010.[2] This statute provides, in pertinent part, that any fourth class city "may receive and hold property, both real and personal, within such city, and may purchase, receive and hold real estate within or without such city for the burial of the dead; *and may purchase, hold, lease, sell or otherwise dispose of any property, real or personal, it now*

2. Statutory references are to RSMo 1994 unless otherwise indicated.

*owns or may hereafter acquire ....*" (Emphasis added.)

Plaintiff argues that § 79.010 only gives the City authority to purchase land outside the City for burial of the dead. Certainly the statute so provides, but it also states that a fourth class city "may purchase ... any property, real or personal...." The latter grant of authority is not conditioned upon any stated purpose.

In *Kennedy v. City of Nevada,* 222 Mo. App. 459, 281 S.W. 56 (1926), a case cited by Plaintiff, the City of Nevada maintained a tourist camp within its city limits. Plaintiff sued the city for maintaining a nuisance and for damages. The city claimed it was not liable to plaintiff because it "had no power to purchase land for the maintenance of a tourist camp." *Id.* at 57. The Court of Appeals "noted that the language of [the identically worded predecessor statute to § 79.010] is unusual" but conceded "that this section standing alone gives unlimited authority to such cities to purchase real estate...." *Id.* at 57–58. The court determined that operation of the tourist camp was not for municipal purposes and reversed the judgment in plaintiff's favor.

We agree with *Kennedy* that § 79.010 contains no limitation on the location of the property purchased so long as the purchase is for a valid municipal purpose. *See State ex rel. Birk v. City of Jackson,* 907 S.W.2d 181 (Mo.App.1995) (upholding purchase of land by fourth class city outside of city limits for landfill based upon implied authority of several statutes). We hold that under § 79.010, Licking had statutory authority to purchase the land if the purchase fulfilled a valid municipal purpose.

This Court discussed the municipal purpose concept in *Siegel v. City of Branson,* 952 S.W.2d 294 (Mo.App.1997). There, we said:

"What constitutes a public purpose is primarily a legislative decision which will not be overturned by the courts unless arbitrary and unreasonable." *Associated Electric Co-op. v. Springfield,* 793 S.W.2d 517, 523 (Mo.App.1990). Missouri courts will defer to a city council when it declares a particular purpose to be a public one, and

not interfere with a discretionary exercise of judgment unless it is clearly erroneous or unreasonable. *J.C. Nichols Co. v. City of Kansas City,* 639 S.W.2d 886, 891 (Mo. App.1982).

"No hard and fast rules exist for determining whether specific uses and purposes are public or private." *Cape Motor Lodge, Inc. v. City of Cape Girardeau,* 706 S.W.2d 208, 213 (Mo. banc 1986). "A municipal purpose is one which comprehends all activities essential to the comfort, convenience, safety and happiness of the citizens of the municipality." *Id.* at 214. The concept is elastic and keeps pace with changing conditions. *J.C. Nichols Co.,* 639 S.W.2d at 891; *Bowman,* 233 S.W.2d at 32. Thus, a definition of public purpose will likely vary with the character of the case in which the term is employed. *Bowman,* 233 S.W.2d at 32.

*Id.* at 296–97.

■ Licking claims its land purchase serves the public municipal purpose of economic development. According to Licking, § 79.110 gives fourth class cities a broad grant of authority to take such actions as "they deem expedient" to promote economic development by trade and commerce. Section 79.110 gives municipal officers the "power to enact and ordain any and all ordinances not repugnant to the constitution and laws of this state, and such as they shall deem expedient for the good government of the city, the preservation of peace and good order, the benefit of trade and commerce and the health of the inhabitants thereof...."

Licking purchased the land after passing an ordinance authorizing the purchase and issuance of the Certificates of Participation. The ordinance referred to the Resolution of March 13, 1997, as the basis for entering into the option for the purchase of real estate. Thus, Licking's Board of Aldermen, by a resolution and ordinance, decided that the land purchase was for the municipal purpose of promoting the City's economic development. Under these circumstances, we must not interfere with Licking's determination as to municipal purpose unless it is " 'clearly erroneous and unreasonable.' " *J.C. Nichols*

*Co.*, 639 S.W.2d at 891(quoting *Parking Systems, Inc. v. Kansas City Downtown Redevelopment Corp.*, 518 S.W.2d 11 (Mo.1974)). Here, Plaintiff does not assert that the Board of Aldermen acted in an erroneous or unreasonable manner. Thus, for that reason alone, we could uphold the validity of Licking's land purchase. However, we are also convinced that the promotion of economic development serves a proper public purpose. Several Missouri cases so hold.

In *State ex rel. Wagner v. St. Louis County Port Authority*, 604 S.W.2d 592 (Mo. banc 1980), the Supreme Court rejected a constitutional challenge to the Missouri Port Authority Law, chapter 68, RSMo 1978. The Court said that the "Act serves a proper public purpose" and does not violate the Missouri Constitution, Article VI, Sections 23 and 25. *Id.* at 596. The Court held that the issuance of revenue bonds pursuant to the Act serves the "essential public purposes of improving employment and stimulating the economy." *Id.* at 597.

In *State ex rel. Jardon v. Industrial Dev. Auth. of Jasper County*, 570 S.W.2d 666 (Mo. banc 1978), relator attacked the Industrial Development Corporations Act because it allowed the expenditure of public funds for other than a public purpose by authorizing the issuance of revenue bonds to finance facilities to be used by private corporations. *Id.* at 673. The Supreme Court rejected this argument holding that issuance of revenue bonds under the Act serves the essential public purposes of improving employment and stimulating the economy. *Id.* at 675. In reaching this result, the Court cited with approval the following language from *City of Pipestone v. Madsen*, 287 Minn. 357, 178 N.W.2d 594, 603 (1970):

"The citizens of Pipestone and the residents of this state will benefit substantially from the proposed transaction. Providing gainful employment for our people will increase their purchasing power, improve their living conditions, and relieve the de-

mand for unemployment and welfare assistance. New or modernized buildings will add properties to the tax lists and increase the tax base. There is little doubt that the establishment of new and improved industry will measurably increase the resources of the community, promote the economy of the state, and thereby contribute to the welfare of its people. These benefits are clearly public in nature."

*Jardon*, 570 S.W.2d at 674–75.

Finally, in *Dysart v. City of St. Louis*, 321 Mo. 514, 11 S.W.2d 1045 (banc 1928), the Supreme Court determined "that the acquisition and control of an airport is a city purpose within the purview of general constitutional law." *Id.* at 1049. In support of this determination, the Court said:

"'Perhaps the best test of rightful taxation is that the proceeds of the tax must be used for the support of the government or for some of the recognized objects of government, or *directly to promote the welfare of the community*. It may also be conceded that that is a public purpose from the attainment of which will flow some benefit or convenience to the public....' 26 R.C.L. 46."

*Id.* at 1047 (emphasis added).

■ Plaintiff's constitutional attack in Point I rests on Article X, Sections 1 and 3, of the Missouri Constitution.[3] Plaintiff claims these sections prohibit Licking from purchasing "land to give to the State for a state project." Plaintiff relies on *State ex rel. City of Jefferson v. Smith*, 348 Mo. 554, 154 S.W.2d 101 (banc 1941), and *Curchin v. Missouri Indus. Dev. Board*, 722 S.W.2d 930 (Mo. banc 1987), in support of this proposition. Neither case aids Plaintiff.

The issue in *City of Jefferson* was whether the city's proposed municipal bonds were "invalid under Sec. 3, Art. X of the constitution." The Supreme Court stated the rule on this issue in the following manner:

---

3. Section 1 provides: "The taxing power may be exercised by the general assembly for state purposes, and by counties and other political subdivisions under power granted to them by the general assembly for county, municipal and other corporate purposes."

Section 3 provides, in pertinent part: "Taxes may be levied and collected for public purposes only...."

"The true distinction drawn in the authorities is this: If the primary object of a public expenditure is to subserve a public municipal purpose, the expenditure is legal, notwithstanding it also involves as an incident an expense, which, standing alone, would not be lawful. But if the primary object is not to subserve a public municipal purpose, but to promote some private end, the expenditure is illegal, even though it may incidentally serve some public purpose. * * * If a public purpose is set up as a mere pretext to conceal a private purpose, of course, the expenditure is illegal and fraudulent." *Bates v. Bassett*, 60 Vt. 530, 531, 15 A. 200, 202, 1 L.R.A. 166. *Id.* at 102.

When Missouri's Unemployment Compensation Commission sought a location for its central offices, Jefferson City was one of the cities interested in housing the Commission. Eventually Jefferson City submitted to its voters the question of incurring an indebtedness to construct a building. The ballot language asked the voters for approval to increase the city's debt "for the purpose of providing funds *for the erection of a municipal office building* . . . ."

Applying the stated rule, the Supreme Court determined that "the submission of the question of indebtedness to construct such a building must have been a subterfuge to obtain money to construct a building for the Unemployment Compensation Commission. Furthermore, the subterfuge is an admission that the construction of an office building for the Commission would not be for a municipal purpose." *Id.* at 104. Therefore, the Supreme Court seemed to say that constructing a building for rental to the State was a private purpose in view of the people's vote for constructing a municipal building.

Here, unlike Jefferson City, Licking did not disguise a non-municipal purpose as a municipal one. In a straightforward manner, Licking purchased the land to induce the State to build a prison for the economic good of the community. Unlike Jefferson City's ballot, Licking's resolution and ordinance both plainly stated a valid municipal purpose, i.e., the economic development of the community.

In *Curchin*, the issue was whether the Missouri Industrial Development Board could validly authorize in its industrial revenue bonds a provision allowing a state tax credit for the amount of any unpaid principal and interest in default as allowed by § 100.297, RSMo Supp.1985. The Supreme Court agreed with appellant's argument that § 100.297 constitutes a grant of public money or property and a lending of public credit in violation of the Missouri Constitution, Article III, Section 38(a), which prohibits the grant of public money or property to a private person, association or corporation. *Id.* at 932. The Court rejected respondent's argument that the tax credits are designed to promote the public purpose of general economic welfare. After citing the Jefferson City case, the court said:

Accordingly, in our application of Article III, Section 38(a) of the Missouri Constitution, we have held grants with a primarily private effect to be unconstitutional, despite the possible beneficial impact upon the economy of the locality and of the state.

*Id.* at 934.

*Curchin* determined that the tax credits led to a primarily private effect because providing them to only a select few companies "lends itself to abuse and is analogous to the railroad grants of yesteryear, which prompted the adoption of Article III, Section 38(a) of the Missouri Constitution." *Id.* at 935.

Licking's land purchase and donation of it to the State does not benefit a "select few" private individuals. The prison will provide employment for many people in the Licking community who will have increased purchasing power. Clearly, increased spending promotes the economy of Licking. As stated in the *City of Pipestone,* "These benefits are clearly public in nature." 178 N.W.2d at 603. Point I lacks merit.

Plaintiff's last point complains that the financial obligations assumed by the City exceeded the limits set by Article VI, Section 26(a), of the Missouri Constitution without a vote of the people and, therefore, the transaction was void.

Plaintiff first seems to argue that Licking's financing agreements with First National Bank of Columbia are improperly some sort of "creative financing." We do not address this issue because it is not stated in Plaintiff's point relied on. This Court is obligated to determine only those questions stated in the points relied on. *Mashburn v. Tri–State Motor Transit Co.*, 841 S.W.2d 249, 252 (Mo. App.1992). Issues alluded to only in the argument portion of the brief are not presented for review. *Id.*

■ We do address Plaintiff's argument that the financial obligations assumed by the City violate Article VI, Section 26(a). That section provides:

No county, city, incorporated town or village, school district or other political corporation or subdivision of the state shall become indebted in an amount exceeding in any year the income and revenue provided for such year plus any unencumbered balances from previous years, except as otherwise provided in this constitution.

Licking is currently obligated to pay the Certificate of Participation holders the sum of $595,000 over a 15–year period. The certificates mature at different times. However, payments are only due once a year on each December 1st, beginning in 1998 and ending in 2012. The first debt payment of principal and interest, totaling $55,130.83, is due on December 1, 1998.

According to Plaintiff, Licking is constitutionally required to show the entire $595,000 debt as an expenditure in its fiscal year of 1998. If this is true, the City would be in violation of Article VI, Section 26(a). On the other hand, if Licking is only required to show the first debt payment of $55,130.83 as a 1998 fiscal year expenditure, it is undisputed that Licking is not in violation of this constitutional provision.

*Mercantile Bank of Illinois v. School Dist. of Osceola*, 834 S.W.2d 737 (Mo. banc 1992), is the leading authority on Article VI, Section 26(a), and decides the issue Plaintiff raises. There, on August 24, 1987, the Osceola School District entered into a 60–month lease of two copy machines and agreed to pay $300 monthly. The lease agreement provided that all payments were accelerated on default. After the school district defaulted in August 1990, Plaintiff accelerated the lease payments and sued for the remaining payments of $8,569.20. The trial court sustained the school district's motion for summary judgment which alleged that under Article VI, Section 26(a), it had no authority to enter into a multi-year lease and that any contract entered in violation of this constitutional provision was void. The Supreme Court disagreed.

Initially, the Court reviewed its earlier decisions construing Article VI, Section 26(a), and decided that a fresh consideration of that provision was warranted. *Id.* at 739. Accordingly, the Court determined that Article VI, Section 26(a), imposes the following two limitations:

Article VI, section 26(a), says first to a political subdivision: "You may not borrow to increase what you have to spend in any year beyond a total of what your taxes will bring in for that year, whatever other income you may have for that year, and what you have left over from previous years that is not already encumbered."

Article VI, section 26(a), also acts as a limitation on expenditures. It also says to a political subdivision, "You cannot spend more than you have."

*Id.* at 741.

Turning to the school district's copier lease, the Court observed that so long as the payments were made, no more than $3600 was due in a given year. The Court then held:

Article VI, section 26(a), does not require the political subdivision, here the School District, to measure the entire lease obligation as a current expenditure. This is the import of the "in any year" and "for such year" language of section 26(a). Instead, rent payments are an expenditure for current expenses of the School District in the year-tight compartments in which those payments are due. Thus, only those payments due in a particular fiscal year are considered expenditures for determining whether the School District exceeded the expenditure limitation imposed by article VI, section 26(a).

*Id.* As a result, the Court determined the lease was not void but "is voidable upon a showing that the School District entered an agreement to pay more than its 'income and revenue provided for such year plus any unencumbered balances from previous years.' Art. VI, § 26(a)." *Id.*

Thus, *Mercantile Bank* teaches that Licking is not required to measure the entire $595,000 debt as a current expenditure. Only the $55,130.83 payment is an expenditure for the City's 1998 fiscal year in determining whether the City exceeded the expenditure limitation under Article VI, Section 26(a). Therefore, by only considering the first year's payment as an expenditure, it is clear that Licking did not exceed the expenditure limitation. Point II is denied.

The summary judgment is affirmed.

SHRUM, P.J., concurs and files concurring opinion.

GARRISON, C.J., dissents and files dissenting opinion.

SHRUM, Presiding Judge, concurring.

I concur in the result reached in the principal opinion. I write separately because I am unpersuaded that *Kennedy v. City of Nevada*, 222 Mo.App. 459, 281 S.W. 56 (1926), stands for the proposition ascribed to it by the principal opinion, i.e., "that § 79.010 contains no limitation on the location of the property purchased so long as the purchase is for a valid municipal purpose."

As I understand it, Kennedy deals solely with the "purpose" for which Nevada acquired the subject real estate and not its location. The property at issue in Kennedy, which Nevada was using as a tourist camp, was located wholly within the city limits of Nevada. Id. at 57. It was in that context that the Kennedy court held that a statute exactly like § 79.010 gave a municipality "unlimited authority ... to purchase real estate." Id. at 58. As such, I cannot ascribe to the view that Kennedy supports Licking's position that it had authority to buy the subject real estate.

Even so, I concur based on other case authority. In *Hafner v. City of St. Louis*, 161 Mo. 34, 61 S.W. 632 (1901), appellants contended that a deed which purportedly conveyed "wharf" real estate to the city was inoperative to pass title to the city for that purpose "in so far as the deed covers land beyond the city limits for wharf purposes." *Id.* at 634. The general corporation statute, Rev. St. 1845, c. 34, § 1, under which the City of St. Louis apparently existed, authorized it "[t]o hold, purchase and convey such real ... estate as the purposes of the corporation shall require." However, the city was not empowered by its charter to purchase land beyond its corporate limits for wharf purposes.

Nevertheless, the Missouri Supreme Court found the conveyance valid with this explanation:

"Though, among the enumerated charter powers of the city at that time in force, no express power is conferred upon the city of St. Louis to purchase, hold or receive land for wharf purposes beyond its corporate limits, and while it is true that the city, in that regard, must act within the express or implied authorization of its charter, by reading its charter powers in connection with its general authority under the statute 'to hold, purchase and convey such real ... estate as the purposes of the corporation shall require ...,' and remembering that no express restriction is found in the city charter against the purchase of such real estate for wharf purposes, it would seem that the city, under its general statutory power, could receive and hold such property, beyond its corporate limits, nor prohibited by its charter, and essentially necessary for the purposes of carrying out one of its proper corporate function and duties, as the establishment ... of a general wharf system along its river front, and by bearing in mind the fact in so doing the beginning or termination of a perfect wharf system must of necessity involve a disregard of the exact corporate limits of the city as at the particular time established." (emphasis supplied).

*Id.* at 634. See also *Dewoody v. Jones*, 202 Ark. 345, 150 S.W.2d 208 (1941) (holding that conveyance to municipal improvement district was not invalid as beyond its power

because it embraced land outside the district where sole purpose was to embrace in conveyance a small house as an incident to the main conveyance).

Here, Plaintiff concedes that the subject property was acquired in a single transaction and that a part thereof lies within the city limits of Licking. Clearly, § 79.010 empowered Licking to buy that part of the tract lying within its corporate limits. Moreover, I concur with the principal opinion that the purchase of this land served the legitimate municipal purpose of economic development. Licking's acquisition of that part of the tract lying outside its corporate limits was merely incidental to the otherwise legitimate purpose of the transaction, which was to promote economic development. See *Dewoody*, 150 S.W.2d at 210. Thus, based on the peculiar circumstances presented by this case and my reading of *Hafner* and *Dewoody*, I concur with the principal opinion that Licking had authority to purchase the entire parcel of land.

I also concur with the principal opinion in all other respects.

GARRISON, Chief Judge, dissenting.

I respectfully dissent. My dissent, however, is limited to the conclusion reached in the principal opinion that Licking was authorized to purchase that portion of the land in question which lies outside the city limits.

§ 79.010 states, in pertinent part:

Any city of the fourth class in this state ... may receive and hold property, both real and personal, within such city, and may purchase, receive and hold real estate within or without such city for the burial of the dead; *and may purchase, hold, lease, sell or otherwise dispose of any property, real or personal, it now owns or may hereafter acquire;* ... (emphasis added).

The principal opinion relies on the italicized language in § 79.010, as interpreted in *Kennedy v. City of Nevada*, 222 Mo.App. 459, 281 S.W. 56 (Mo.App.1926), in reaching the conclusion that the statute contains no limitation on the location of property purchased by a fourth class city, so long as it is for a valid

municipal purpose. While *Kennedy* contains language saying that "this section standing alone gives unlimited authority to ... purchase real estate" (281 S.W. at 58), it is important to remember that the land in question in that case was entirely within the city limits. Additionally, the issue there was whether the land was purchased for "municipal purposes"; not whether its acquisition was unauthorized because it was outside the city. In *Kennedy*, the reference to the language from § 79.010 ("may purchase, hold, lease, sell or otherwise dispose of any property, real or personal, it now owns or may hereafter acquire") was with reference to whether the *purpose* of the acquisition was authorized. Because the reference to the § 79.010 language in *Kennedy* was on an entirely different issue, I view it as dictum when considering whether Licking had authority to purchase that portion of this land lying outside the city.

While I do not disagree with the principal opinion's holding that the land in question was acquired for municipal purposes, I do believe that before that issue is reached, statutory authority upon which to base the acquisition must first be found. I do not believe that the existence of a municipal purpose, alone, is sufficient to authorize a fourth class city to acquire land outside its city limits.

The portions of § 79.010 quoted above have remained unchanged since adopted in that form in 1895. Since that time, the legislature has enacted numerous statutes which specifically authorize a city to acquire land outside its corporate boundaries. For instance, § 71.680, adopted in 1939, specifically authorizes fourth class cities to acquire land outside the city limits for garbage and municipal waste incinerators; § 79.390, first adopted in 1929, authorizes fourth class cities to purchase land within the city or within three miles thereof for public parks; § 90.010, enacted in 1939, authorizes any city to acquire land within the city or within one mile of its limits for park or "pleasure grounds"; § 79.380, enacted in 1929, authorizes fourth class cities to purchase either within the city limits or within ten miles thereof, land for hospital purposes, water-

works, and sewer carriage and outfall. Other statutes have provided specific authorization for the acquisition of land by all cities, towns, and villages, including fourth class cities, for specified purposes. Among them are: §§ 71.310, 71.340, 71.350, 79.390, 88.667, 91.010, 91.450, and 214.010.

The primary object in interpreting statutes is to ascertain the intent of the legislature from the language used and to give effect to that intent. *State ex rel. Degeere v. Appelquist*, 748 S.W.2d 855, 857 (Mo.App. S.D. 1988). In doing that, the words used are considered in their plain and ordinary meaning. *Id.* Courts, however, look beyond the plain and ordinary meaning of a statute if its meaning is ambiguous or will lead to an illogical result which defeats the intent of the legislature. *Kansas City Star Co. v. Fulson*, 859 S.W.2d 934, 938 (Mo.App. W.D.1993).

In this case, if the quoted language from § 79.010 is applied literally, it would indeed authorize a fourth class city to acquire land anyplace. In my opinion, it is incorrect to construe the language of § 79.010 in that manner. If that were the correct interpretation, there would have been no reason for the same statute to specifically authorize the purchase of land outside the city for the burial of the dead. Likewise, after the adoption of the § 79.010 language, no purpose would have been served by the legislature continuing to enact other statutes specifically authorizing fourth class cities to acquire land outside their corporate boundaries for specific purposes.

The enactment of a statute should not be construed as a useless act because it is ordinarily the intent of the legislature to effect some change in existing law. *Klinginsmith v. Mo. Dept. of Consumer Affairs*, 693 S.W.2d 226, 230 (Mo.App. W.D.1985). As applied here, if the quoted language from § 79.010 had already authorized the purchase of land outside the city, the subsequent statutes would have been useless acts and would not have effected a change in existing law. To me, a reasonable explanation is that the legislature never intended § 79.010 to be a blanket authorization for the acquisition of land for any purpose or at any location outside the city. In fact, *Kennedy* stands for

the proposition that the quoted language from § 79.010 is not authority for a city to acquire land for *any* purpose, even if it is inside the city; rather it must be for a valid municipal purpose. 281 S.W. at 58.

Where one statute deals with a subject in general terms and another in specific terms, the two should be harmonized when reasonable, but the definite statute prevails in the event of discord between them. *Bartley v. Sp. Sch. Dist. of St. Louis Cty.*, 649 S.W.2d 864, 867 (Mo. banc 1983). Here, the quoted language from § 79.010 is in general terms, while the subsequently enacted statutes authorizing land acquisitions are specific. Accordingly, the more specific statutes would prevail in the area of authority to acquire land outside the city limits.

As noted in the principal opinion, a municipality, being a creature of statute, has only the powers granted by the legislature, courts apply a rule of strict construction when determining those powers, and any doubt about the power of a public subdivision is construed against the grant of that power. Specifically, a fourth class city has only such powers as are conferred upon it by the State. *State ex rel. City of Republic v. Smith*, 345 Mo. 1158, 139 S.W.2d 929, 932 (Mo. banc 1940). It has been said that a municipal corporation possesses, in addition to those powers expressly granted, those that are fairly implied in, or incidental to, express grants, or those essential to the declared objects of the municipality, "and any reasonable doubt as to whether a power has been delegated to a municipality is resolved in favor of non-delegation." *City of Kirkwood v. City of Sunset Hills*, 589 S.W.2d 31, 35–36 (Mo.App. E.D.1979). Unlike *State ex rel. Birk v. City of Jackson*, 907 S.W.2d 181 (Mo.App. E.D.1995), referred to in the principal opinion, we are not dealing here with authority implied from an "express" grant of authority for a specific purpose. In fact, if § 79.010 provided the breadth of authority argued by the Plaintiff in this case, there would have been no need for the court in *Birk* to look for implied authority. It could have found express authority by looking only at § 79.010. I find significance in the fact that the *Birk* court

did not rely on the interpretation of § 79.010 which is followed in the principal opinion.

I do not believe that the quoted language from § 79.010 gave authority to Licking to purchase that portion of the land outside the city limits, even if it was for a municipal purpose. Accordingly, I believe that Licking was not entitled to a judgment as a matter of law, and that the summary judgment entered in its favor was improvidently granted. I would reverse that ruling.