Greg **COURSEN** and Carolyn Coursen, **Plaintiffs–Appellants,**

v.

**CITY OF SARCOXIE, Missouri, Defendant–Respondent.**

No. 25395.

Missouri Court of Appeals, Southern District, Division Two.

Jan. 14, 2004.

J. Michael Riehn, Cassville, for Appellants.

Chuck D. Brown, Joplin, for Respondent.

JEFFREY W. BATES, Judge.

Greg and Carolyn Coursen ("the Coursens") appeal from a judgment denying their petition for a temporary restraining order, preliminary injunction and permanent injunction against the City of Sarcoxie, Missouri ("the City" or "Sarcoxie"). The Coursens contend that the trial court erred in refusing to enjoin the City from: (1) changing its method of billing for the water and sewage services that it provides to the Coursens' mobile home park; and (2) requiring the Coursens to assume responsibility for maintenance of the mobile home park's water lines, water meters and sewer lines. For the reasons discussed below, we affirm the trial court's judgment.

## I. Standard of Review

The judgment in favor of the City was entered after a bench trial. Therefore, we must affirm the trial court's decision unless it is not supported by substantial evidence, it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976); *Scott v. Clanton*, 113 S.W.3d 207, 211 (Mo.App.2003). All evidence favorable to the judgment and all inferences to be drawn from the evidence are accepted as true, and all contradictory evidence is disregarded. *Brinner v. Huckaba*, 957 S.W.2d 491, 494 (Mo.App.1997). Credibility of the witnesses and the weight to be given to their testimony is for the trial court, which is free to believe none, part, or all of the testimony of any witness. *Keller v. Friendly Ford, Inc.*, 782 S.W.2d

170, 173 (Mo.App.1990). We defer to the trial judge's superior opportunity to assess the witnesses' credibility. *Harris v. Lynch*, 940 S.W.2d 42, 45 (Mo.App.1997). Neither party requested findings of fact or conclusions of law from the trial court. Consequently, all fact issues are to be considered found in accordance with the result reached, and the trial court's judgment is to be upheld on any reasonable theory within the pleadings and supported by the evidence. *See* Rule 73.01(c); *Underwood v. Hash*, 67 S.W.3d 770, 774 (Mo. App.2002).[1] The following summary of the facts has been prepared in accordance with these principles of appellate review.

## II. Facts and Procedural History

On June 10, 1998, the Coursens purchased a mobile home park located outside the city limits of Sarcoxie. This property, known as the Autumn Acres Mobile Home Park ("Autumn Acres"), was a parcel of real estate approximately 17 acres in size. At the time the Coursens purchased the property, there were 28 mobile homes located on rented lots at the site. Water and sewage services were being provided to the residents of Autumn Acres by the City, although not pursuant to any written contract with the City to do so. Each lot in the mobile home park was equipped with an individual meter to record water usage.[2] City personnel read these water meters each month, and bills for water and sewage services were then sent to the owner of each mobile home. New residents of Autumn Acres who wanted water and sewage services from the City had to fill out an application and pay a combined water and sewage service deposit of $50.00. A City employee would then come to Autumn Acres, turn on the individual water meter, and take an initial meter reading to be entered into the City's billing system.

After the Coursens purchased Autumn Acres, this same billing practice continued. For mobile homes not owned by the Coursens that were located on lots rented from them, the City billed the owner of the mobile home for monthly water and sewage service, plus an additional fee of $10.50 per mobile home for out-of-city-limits service.[3] For each mobile home that was owned by the Coursens and leased by them to a tenant, the City sent an individual monthly bill for water and sewage services, plus the $10.50 per mobile home fee, to the Coursens.[4] As had been the case with the prior owner of Autumn Acres, there was no written contract between the Coursens and the City concerning the provision of water and sewage services to the mobile home park.

Soon after the Coursens purchased Autumn Acres, they expanded the size of the mobile home park from 28 lots to approximately 80 lots. Additional water lines, sewer lines and individual water meters for each new lot were installed at the Coursen's expense by John Gautz, a private contractor hired by the Coursens to do that work. The City exercised no con-

---

1. In this opinion, all references to rules are to the Missouri Rules of Civil Procedure (2003). All references to statutes are to RSMo 2000.

2. The Coursens did not know who had installed the individual water meters that were present in Autumn Acres when they purchased the property.

3. This fee is paid by all out-of-town users who are connected to the City's water and sewage system. The fee represents that portion of the taxes paid by City residents, figured on a monthly basis, that goes to defer the cost of maintaining the water and sewage system.

4. In addition to buying the real estate, the Coursens also purchased some of the mobile homes that were located within Autumn Acres at the time of the sale.

trol over the manner in which the water and sewer lines were laid out in the area of expansion, but a City inspector did examine and approve the work at the conclusion of the construction. At no time after the Coursens purchased Autumn Acres did the City perform any maintenance upon the water lines, sewer lines or water meters located within the mobile home park.

In the summer of 2002, the Coursens received a notice from the City that, effective October 1, 2002, the billing procedure that had been in use since 1998 would be changed. Under the new plan, the City would place a single water meter at the entrance to Autumn Acres to record the entire amount of water used by all of the residents of the mobile home park. The Coursens would be sent one bill for the entire amount of that month's water and sewer charges, plus the $10.50 per mobile home out-of-city-limits fee. Under the new plan, it would be up to the Coursens to obtain reimbursement for these expenses from their tenants. The Coursens also were told that they would be responsible for all required maintenance of the water supply lines, connected water meters and waste water lines within the park.

On September 24, 2002, the Coursens filed a petition in the Circuit Court of Jasper County, Missouri, seeking a temporary restraining order, preliminary injunction and permanent injunction against the City to prevent the implementation of the new plan. On September 25, 2002, the trial court denied the Coursens' request for a temporary restraining order because they failed to comply with the requirements of Rule 92.02.[5] The trial court's order directed the clerk to process the case as a normal civil action. The City's answer was filed in due course, and the case was tried on the merits on November 13, 2002.

At trial, there was considerable testimony concerning the City's reasons for wanting to implement changes in the billing system used for Autumn Acres. In order to generate monthly water and sewage bills for residents of the mobile home park, the City had to send several employees to read approximately 80 individual water meters and determine how much water had been used per lot. Each individual meter reading was then typed into the computerized billing system at City Hall. Every month when the water meters were read, the computer system would identify some meter readings which appeared too high.[6] These abnormal readings necessitated another trip to Autumn Acres to reread the meters in question. After final verification of meter readings, bills for water and sewage services were mailed out around the first of the month.

Because each lot in Autumn Acres had its own water meter, City employees had to make frequent trips to the mobile home park. Each time a new resident moved into Autumn Acres and established water and sewage service with the City, a City employee had to go to the mobile home park to turn on the individual water meter and take an initial meter reading. Similarly, each time a resident moved out of the mobile home park, a city employee had to go to the park and turn off the individual water meter. At the end of each month, the City also had to send employees to the park to turn off the water meters of any

---

**5.** It appears from the legal file that the Coursens failed to comply with Rules 92.02(b)(1), 92.02(b)(2) and 92.02(d).

**6.** Quite often, meter readings appeared too high because the persons living in the mobile

homes had changed without the City being notified. Tenants at Autumn Acres would often leave without notifying the City, or they would move into a different mobile home in the park than was shown on City records.

park residents who had not paid their water bills. At least 15 meters had to be shut off at Autumn Acres each month due to tenants' failure to pay their bills. Even after a meter had been turned off because of nonpayment, City employees often had to return to the mobile home park and turn off the same meter again because it had been reactivated by some unauthorized person. City employees made about 30 trips to Autumn Acres each month to turn water meters on and off.

Getting paid for water and sewage service provided to residents of Autumn Acres also proved problematical for the City. There were a number of instances in which tenants had moved out of the mobile home park without paying for water and sewage service that had been provided by the City. Sarcoxie had in effect a municipal ordinance making the owner and occupant of rental property jointly and severally liable for water and sewage services provided to the tenant.[7] The City presented evidence that the Coursens had failed to pay approximately $1,850 of their tenants' delinquent bills as required by the ordinance. City Collector Kristi Roberson testified that she sent the Coursens a letter on June 20, 2003, listing by name all of the Autumn Acres tenants who had moved out of the mobile home park without paying their water and sewage bills.[8] The purpose of the letter was to collect these unpaid water and sewage bills directly from the Coursens. Roberson also testified that the Coursens were present during a City Council meeting at which the delinquent bills of the Coursens' tenants were discussed. In addition, Roberson spoke personally with Beverly Coursen by telephone about the bills. The Coursens never paid the amounts due, and the City eventually wrote off the delinquent bills as uncollectible.

To address these issues, City Superintendent Jeremy Lawyer and City Collector Roberson developed the new billing procedure described above. The purpose of the new plan was to save the City time and money. The new billing system was designed to: (1) reduce meter reading time, in that only one meter would need to be read instead of 80; (2) reduce or eliminate meter rereading concerns; (3) eliminate the administrative burden of keeping track of the frequent changes of occupancy in the various mobile homes at Autumn Acres and updating the City's billing records; (4) save time and money in the billing process, in that only one meter reading from Autumn Acres would have to be typed into the system, and only one bill would have to be generated; and (5) eliminate the time and expense the City previously devoted trying to collect delinquent water bills from the Coursens' tenants. Sarcoxie's mayor, Alice Canfield, testified that the new billing system would be in the City's best interest. Sending a single bill to the Coursens, versus multiple bills to their tenants, was more efficient and improved the City's ability to get paid for water and sewage services provided to the residents of Autumn Acres. The new billing plan the City proposed for Autumn Acres was not unique. There were several other multi-family dwellings in Sarcoxie in which water was supplied to the premises through a single meter. The cost of water and sewage services was either included as part of the rent charged to tenants who

---

7.  Sarcoxie Municipal Ordinance 27.180 was admitted in evidence as Plaintiffs' Exhibit 2.

8.  Roberson's letter was admitted in evidence as Defendant's Exhibit A. The unpaid bills

listed in the letter totaled approximately $1800. Roberson also identified another outstanding bill in the amount of $49.50 on Plaintiffs' Exhibit 3.

resided there, or divided among the tenants by the owner.

The evidence also demonstrated that the Coursens would have the ability, if they so desired, to recoup any amounts they paid for water and sewage services provided to their tenants. Mrs. Coursen testified that their leases with tenants were of the month-to-month type. Nothing in the lease agreements would prohibit the Coursens from changing the leases, after giving proper notice, so as to permit them to collect water and sewage fees from their tenants as part of the rent. Beverly Neilson, who managed Autumn Acres for the Coursens, likewise testified that, after giving proper notice, the Coursens could simply increase the rent to reimburse themselves for the extra cost of water and sewage service that they would be paying to the City under the new billing plan.

At the conclusion of the trial, the court took the case under advisement. On December 19, 2002, a judgment was entered in favor of the City denying the Coursens' request for injunctive relief. From that judgment, the Coursens have appealed.

### III. Analysis

In the Coursens' single point relied on, they contend that the trial court erred in denying their petition for preliminary and permanent injunctive relief because Sarcoxie, as a fourth class city, lacked the statutory authority to change its billing system in the respects proposed and to make the Coursens responsible for any maintenance performed on the water and sewer system at Autumn Acres.[9] The Coursens argue that the trial court's decision erroneously declared the law, erroneously applied the law, is not supported by substantial evidence and is against the weight of the evidence, thereby exhausting all avenues of assault on the judgment authorized by *Murphy v. Carron, supra.*

■■■ We initially address the Coursens' argument that the trial court erred in denying their request for a preliminary injunction. Our review of this aspect of the Coursens' point is precluded for two independent reasons. First, an order denying a preliminary injunction is interlocutory and not appealable. All three Districts of the Court of Appeals have so held. *See Hagen v. Bank of Piedmont,* 763 S.W.2d 384, 385 (Mo.App.1989); *St. Louis Tele-Communications, Inc. v. People's Choice TV of St. Louis, Inc.,* 955 S.W.2d 805, 808 (Mo.App.1997); *Leone v. Leone,* 917 S.W.2d 608, 616 (Mo.App.1996). Second, we find no indication in the record that the Coursens ever asked the trial court for a ruling on their request for a preliminary injunction. A party seeking injunctive relief can elect to forego the preliminary injunction phase of the proceeding and move directly to a trial on the merits for a permanent injunction. *See Pomirko v. Sayad,* 693 S.W.2d 323, 325 (Mo.App.1985); *Bayer v. Associated Underwriters, Inc.,* 402 S.W.2d 11, 12 (Mo. App.1966). That was the procedure followed here. The Coursens' lawsuit was filed on September 24, 2002. The next day, the trial court issued an order denying the Coursens' request for a temporary restraining order due to noncompliance with the requirements of Rule 92. Thereafter, the Coursens made no request for a hearing to obtain a preliminary injunction. On October 7, 2002, the trial judge gave

---

9. A fourth class city is one containing between 500 and 2,999 inhabitants. *See* § 79.040. According to the 2000 census, Sarcoxie had a population of 1,354 residents. Therefore, we take judicial notice that Sarcoxie is a fourth class city. *See Shelby County R–IV School District v. Herman,* 392 S.W.2d 609, 610 (Mo.1965); *State v. Padgett,* 316 Mo. 179, 289 S.W. 954, 956 (1926).

the case a number one trial setting for November 13, 2002. When trial commenced, the City's answer was on file, and both parties announced ready for trial. Thus, the Coursens elected to forego any ruling on their request for a preliminary injunction and proceed directly to a trial on the permanent injunction phase of the proceeding. A party cannot complain on appeal of any alleged error in which, by his own conduct, he joined or acquiesced. *Tate v. Department of Social Services,* 18 S.W.3d 3, 7 (Mo.App.2000); *Johnson v. Moore,* 931 S.W.2d 191, 195 (Mo.App.1996).

■ So pruned, the only issue properly presented by the Coursens' appeal is whether the trial court erred in denying their request for a permanent injunction. An injunction is a harsh remedy which is to be used sparingly and only in clear cases. *Neaf v. Mallory,* 622 S.W.2d 372, 373 (Mo.App.1981). The Coursens bore the burden of proving their entitlement to such relief. *See Cook v. Rupp,* 565 S.W.2d 833, 837 (Mo.App.1978); *Minton v. Steakley,* 466 S.W.2d 441, 443 (Mo.App.1971). One indispensable requirement for obtaining injunctive relief is the wrongful and injurious invasion of some legal right existing in the plaintiff. *Moseley v. City of Mountain Grove,* 524 S.W.2d 444, 446 (Mo.App.1975). The trial court could properly have denied the Coursens' request for a permanent injunction on the ground that this requirement was not satisfied.

■ As a fourth class city, Sarcoxie is authorized by § 250.020 to operate a combined waterworks and sewage system. The City has express statutory authoriza-

tion to provide such combined services to premises outside the City's boundaries. Section 250.190; *Missouri Cities Water Co. v. City of St. Peters,* 534 S.W.2d 38, 40 (Mo.1976). However, a municipality's decision to provide water and sewage services to an area outside the municipality's territorial limits is discretionary. *Bailey v. City of Goodman,* 69 S.W.3d 154, 156 (Mo.App.2002). When a municipality decides to sell water or sewer services to nonresidents, it does so on a purely contractual basis. *See Forest City v. City of Oregon,* 569 S.W.2d 330, 334 (Mo.App.1978); *AG Processing, Inc. v. South St. Joseph Industrial Sewer District,* 937 S.W.2d 319, 324 (Mo.App.1997). In order for any such contract to be enforceable, however, it must be in writing. *See* § 432.070; [10] *Vochatzer v. Public Water Supply District No. 1 of Lafayette County,* 637 S.W.2d 418, 419–20 (Mo.App.1982); *Plaster v. Lebanon Special Road District of Laclede County,* 611 S.W.2d 560, 564 (Mo.App.1981). Missouri law is clear that all persons dealing with a municipal corporation are charged with notice of § 432.070. *Duckett Creek Sewer Dist. of St. Charles County v. Golden Triangle Development Corp.,* 32 S.W.3d 178, 182 (Mo.App.2000).

■ In the City's answer, it specifically asserted the absence of any written contract between itself and the Coursens as a defense to the request for injunctive relief. At trial, the City's allegation was proven. The testimony from both the Coursens and the City established that there was no written contract between them governing the provision of water and sewage services

---

**10.** This statute states: "No county, city, town, village, school township, school district or other municipal corporation shall make any contract, unless the same shall be within the scope of its powers or be expressly authorized by law, nor unless such contract be made upon a consideration wholly to be performed or executed subsequent to the making of the contract; and such contract, including the consideration, shall be in writing and dated when made, and shall be subscribed by the parties thereto, or their agents authorized by law and duly appointed and authorized in writing."

to Autumn Acres. In the absence of a written contract prohibiting changes in the billing system being used and requiring the City to perform all necessary maintenance, the Coursens had no existing legal right to have an injunction issued to prevent such changes. We find *Vochatzer, supra*, particularly instructive in this regard.

In *Vochatzer*, the plaintiff sued a water district and sought a mandatory injunction compelling the district to furnish him water. Vochatzer had granted the district an easement to run a water line across his property. He did so based on an oral promise by one of the district's board members that the district would provide Vochatzer with water in return for the easement. When Vochatzer applied to receive water, he was denied access by the district. The trial court found that the district had ratified the board member's oral promise and granted a mandatory injunction requiring the district to connect Vochatzer's property to the water line. *Vochatzer*, 637 S.W.2d at 419. The Western District reversed the trial court's judgment granting the injunction because Vochatzer failed to plead and prove that the alleged contract with the district was in writing:

> The decisive point on this appeal is the failure of Vochatzer to allege and prove that the alleged contract was made according to the law applicable to the District. The District was organized under Chapter 247, RSMo 1978. Section 247.080.5 provides that all contracts made by the District shall conform to the law governing contracts of other municipal corporations. Section 432.070 requires contracts made by municipal corporations to be in writing and subscribed by the parties thereto or their agents authorized by law and duly appointed and authorized in writing. It is apparent from the pleadings and the proof that the contract relied upon by Vochatzer to supply him water was not in writing.

(Footnote omitted.) *Vochatzer*, 637 S.W.2d at 419–20. Thus, the absence of a written contract was fatal to Vochatzer's request for injunctive relief. We reach the same conclusion here.

In addition to the absence of a written contract, there are other reasons supporting our conclusion that the Coursens had no existing legal right to prevent, via injunction, proposed changes in the City's billing system that had been in effect from June 1998 to October 1, 2002, or the allocation of responsibility for maintenance of the water and sewage system within the mobile home park. Under the new billing system, the Coursens would receive one bill from the City for all of the water and sewage services provided to the residents of Autumn Acres. The new plan effected no change whatsoever in the Coursens' ultimate liability for such charges. The evidence at trial established that the Coursens were already jointly and severally liable to pay for such services provided to their tenants pursuant to City Ordinance No. 27.180. The Coursens admitted that they were obligated to pay, and had in fact paid, their tenants' delinquent bills pursuant to this ordinance. Moreover, the same obligation is imposed upon the Coursens by statute:

> Sewerage services or water and sewerage services combined shall be deemed to be furnished to both the occupant and owner of the premises receiving such service and the city, town or village or sewer district rendering such services shall have power to sue the occupant or owner, or both, of such real estate in a civil action to recover any sums due for such services, plus a reasonable attorney's fee to be fixed by the court.

§ 250.140.1. The Coursens had no existing legal right to prevent the City from simply

billing them, in the first instance, for amounts which they are already jointly and severally liable to pay. By its very nature, joint and several liability means that "each liable party is individually responsible for the entire obligation." Black's Law Dictionary 926 (7th Ed.1999); *see also State ex rel. State Highway Commission v. Morganstein*, 649 S.W.2d 485, 489 (Mo.App.1983) (under the doctrine of joint and several liability, each responsible party is liable for the full amount owed on the obligation). We also do not find that the Coursens had any existing legal right to require the city to maintain the water and sewage system in Autumn Acres. The City's testimony established that the Coursens paid for all of the improvements to the water and sewage system during the expansion of the mobile home park and that the City never performed any maintenance whatsoever on the water lines, water meters or sewer lines after they were installed. Since these items are located on the Coursens' premises, were installed at their expense for commercial purposes and were never maintained by the City, it is difficult for us to understand how the responsibility for maintenance is being transferred to the Coursens, as they contend.

We need touch but briefly upon the arguments advanced by the Coursens in their brief. They contend that the City lacked the statutory authority to change its billing system and maintenance arrangements. We disagree. A municipality may exercise those powers expressed or implied by statute. *Burks v. City of Licking*, 980 S.W.2d 109, 111 (Mo. App.1998). Section 250.140 makes the Coursens liable for any water and sewer services provided to their tenants and permits the Coursens to be sued to recover such amounts. That statute gives the City the implied power to send water and sewage bills to the Coursens in the first instance. In our view, the express power to sue carries with it a grant of the implied power to request payment from the liable party prior to suit being filed. With respect to the maintenance issue, the Coursens have cited no authority demonstrating that the City was under any duty to maintain water lines, water meters and sewer lines which were located on the Coursens' private property and purchased with their own money. Accordingly, no duty of performing maintenance was being transferred to them. Finally, we reject the Coursens' argument that the trial court's judgment was not supported by substantial evidence, and was against the weight of the evidence, because the proposed changes served no legitimate governmental purpose. There was ample testimony presented, which the trial court had a right to believe, that the new system would be more efficient and would save the City both time and money if implemented. The pursuit of efficiency and economy is a manifestly legitimate governmental purpose.

## IV. Disposition

Based on our review of the record, we conclude that the Coursens did not possess any existing legal right, enforceable by injunction, to prohibit the City from modifying its billing system or requiring the Coursens to maintain the water and sewage system within Autumn Acres. Therefore, the trial court properly denied the Coursens' request for a permanent injunction. The judgment does not erroneously declare or apply the law, is supported by substantial evidence, and is not against the weight of the evidence. Accordingly, we affirm.

SHRUM, J., and RAHMEYER, C.J.-P.J., concur.